STATE OF VERMONT
ENVIRONMENTAL COURT

|  |  |  |
|---|---|---|
| In re: Pierce Woods PRD and | } | |
| Subdivision Application | } | Docket No. 33-2-06 Vtec |
| (Appeal of Schumacher) | } | |

**Merits Decision**

This appeal concerns a combined application for two subdivisions. The first subdivision proposes to divide the 296± acres of Mr. & Mrs. Pierce into two lots, the first lot containing about 113 acres and the second lot containing about 183 acres. No plans for further development of the second lot have been proposed at this time. The second subdivision involves the proposed development of the 113± parcel into a 21-lot planned residential development (PRD), with an additional 22nd lot to be reserved as common land.

Abutting property owners Robert and Bonnie Schumacher[1] appealed to this Court the January 24, 2006 decision of the Ferrisburgh Planning Commission to grant final plat approval to the proposed subdivision and PRD applications. Robert Schumacher is represented by Carl H. Lisman, Esq. Ferrisburgh Realty Investors, LLC ("FRI"), is represented in this appeal by John W. O'Donnell, Esq. John and Irene Pierce are the owners of the subject property, but have not entered their appearance in this proceeding. The Town of Ferrisburgh (Town) is represented here by James F. Carroll, Esq. Jeffrey J. Vigne has entered his appearance as an Interested Person in this proceeding and represents himself.

After the Court issued its Interim Order of July 11, 2006, the Court conducted a merits hearing on July 20, 2006. Prior to trial, Attorney Carroll reported that the Town had requested that he not participate in the trial, and that he therefore would not be attending. Upon the close of evidence, the parties requested time to submit proposed Findings of Fact and Conclusions of Law. The Court granted this request and deemed those filings complete on September 6, 2006.

Based upon the evidence admitted at trial, including the admitted evidence put into context by the site visit the Court conducted with the parties just prior to trial, the Court makes the following Findings of Fact and Conclusions of Law:

---

[1] By Interim Decision filed July 11, 2006, the Court granted in part Developer's pending motions by dismissing Bonnie Schumacher as an appellant in this proceeding.

**Findings**

1.      FRI and the Pierces (hereinafter collectively referred to as "Applicants") first submitted their applications for final subdivision approval[2] on July 27, 2005.

2.      The first subdivision divides the Pierces' 296± parcel into two unnumbered lots: one with 112.65 acres (the "113± acre parcel") and the second containing the remaining land of 183.35 acres (the "remainder parcel").

3.      Applicants propose to further subdivide the 113± acre parcel into a total of 22 lots, 21 of which are proposed to be the future sites of single family dwellings.   This 21-lot PRD subdivision is depicted on Applicants' "Overall Site Plan," admitted into evidence as Exhibit 1,[3] a reduced copy of which is attached to this Decision for the readers' reference.

4.      The initial, two-lot proposed subdivision is not evidenced in its entirety by any site plan submitted into evidence.   In particular, the Court has no site map that shows the proposed remainder lot in its entirety.   Portions of proposed Lots 18 and 21 are also not fully depicted on Applicants' Overall Site Plan (Exhibit 1).

5.      Nearly all of the proposed lots on the 113± acre parcel are less then one and a half acres in size.   Five of the proposed lots, Lots 1, 2, 17, 18 and 21, are larger parcels (9.08 acres, 25.9 acres, 17.28 acres 16.27 acres and 20.7 acres, respectively) which Applicants propose to encumber with some type of conservation easement, one purpose of which is to evidence the acreage that may be allocated to the other undersized lots.   Applicants summarized which of the smaller proposed lots would benefit from an acreage allocation on the larger lots in their "PRD Analysis Sheet," admitted into evidence as Exhibit 2, a copy of which is attached to this Decision for the readers' reference.

6.      Applicants propose to convey conservation easements encumbering portions of Lots 1, 2, 17, 18 and 21 to the Vermont Land Trust or a similar not-for-profit entity, if the PRD subdivision is approved.   Applicants have not yet drafted the specific terms of these conservation easements, but generally described them at trial as prohibiting further development in the areas identified on Exhibit 1 and allowing the area to remain in its natural state.

---

[2]  The Planning Commission previously granted sketch and preliminary approvals for the proposed subdivisions and classified the 22 lot subdivision as a major subdivision, as provided in Ferrisburgh Subdivision Regulations § 220.3. No evidence has been submitted in this proceeding to show that an appeal was taken from either the sketch or preliminary plan determinations.

[3]  The Exhibit 1 admitted at trial contained 6 pages of various plans.  The Exhibit 1 attached here only contains the first page of the trial Exhibit 1, entitled "Overall Site Plan."

7. Applicants propose that the 113± parcel, if the proposed subdivisions are approved, be restricted from further subdivision.

8. In light of the proposed conservation easements and the prohibition on further subdivision, more than 60% of the 113± parcel will remain undeveloped.

9. The Pierces' current 296± parcel has road frontage on Stage Road. Only Lots 1 and 2 will have road frontage under the subdivision as proposed. The remaining lots will be served by a sixty-foot wide access way easement. This access way easement will also serve the pre-existing, adjoining parcels upon which the Schumacher and Pidgeon homes are sited.

10. This sixty-foot wide access way easement will serve all of the proposed lots and will lie within the common area Applicants intend to establish once they receive subdivision approval. The common area is to be maintained by the homeowners' association. Within the sixty-foot wide access way easement will be a private roadway, to be known as Pierce Woods Road, the traveled portion of which will be about 20 feet wide. This private roadway will contain two oval turn around areas, each serving a cluster of homes on the proposed lots; it is about 3,500 feet long and is depicted on the attached reduced copy of Exhibit 1.

11. The Pierces had previously sought and obtained subdivision approval for the creation of several other residential lots from their original parcel off of Stage Road. Two of the previously approved one-acre lots that have not yet been sold or developed will be "reabsorbed" into the current proposed 21-lot PRD subdivision.

12. The 113± parcel extends over three zoning districts: the Rural Residential District (RR-2 District), the Rural Agricultural District (RA-5 District), and the Conservation District (the Con-25 District).

13. The applicable zoning districts contain the following dimensional standards:

|  | RR-2 District | RA-5 District | Con-25 District |
|---|---|---|---|
| Min. lot size | 2 acres | 5 acres | 25 acres |
| Min. acreage for Ea. Dwelling | 2 acres | 5 acres | 25 acres |
| Lot frontage & Width minimums | 200 ft. | 400 ft. | 500 ft. |
| Lot depth min. | 350 ft. | 450 ft. | 500 ft |
| Front yard min. From road center | 80 ft. | 80 ft. | 80 ft. |
| Side & rear yard Setbacks | 25 ft. | 25 ft. | 25 ft. |
| Building height | 35 ft. | 35 ft. | 35 ft. |

Ferrisburgh Zoning Bylaws §§ 4.1, 4.2 and 4.2.

14.    The area within the 113± acre parcel is estimated to break down into the following components:

|  | Total acres | Total easement area[4] | Road portion of easement[5] |
|---|---|---|---|
| RR-2 District | 18.2 | 2.2 acres | 0.462 acres[6] |
| RA-5 District | 61.2 | 3.2 acres | 1.154 acres |
| Con-25 District | 33.3 | -0- | -0- . |
| Totals: | 112.7 | 5.4 acres | 1.616 acres |

15.    FRI provided a narrative with its application (Exhibit 4) that contains an overview of its project and an explanation for why it believed the following six waivers from the zoning district requirements should be granted:

1. A reduction . . . [in] minimum lot size [to a third] of an acre in size. A number of 1-acre lots had already existed on the property. This reduction allows the PRD to function as intended by giving it the flexibility to maximize preserved open space and existing natural features.

2. A reduction, as applicable, to the minimum acreage per dwelling to 1/3 of an acre, so long as this reduction does not affect the total number of units allowed.

3. Reduction in lot frontage and lot width minimum to 60 feet;

4. Reduction in minimum lot depth requirement to 125 feet;

5. Reduction in the front yard setback minimum to 55 feet ([measured from the] centerline of road to dwelling); [and]

6. Reduction in the rear and sideyard setbacks to 15 feet[.]

16.    Applicants' Overall Site Plan (Exhibit 1) shows proposed house sites within building envelopes. The house sites are not exact, but will be located within the building envelopes. The homes will be oriented to the southeast, south, or southwest. No proposed building will shadow any other proposed building in the subdivision.

17.    Much of the area in which the 21 dwelling units will be sited is currently wooded. The site visit put into context the nature of the areas proposed to be developed. Portions of the

---

[4] The roadway easement is proposed to be 60 feet wide. These calculations, taken from Appellants' estimates, appear to also include the green-space area within the two oval loops on the proposed roadway.

[5] The width of the traveled portion of the roadway is proposed to be about 20 feet.

[6] Applicants' expert testified at trial that this calculation did not include some part of the pre-existing private road on the 113± acre parcel. The expert later testified that he redid his calculations to include the omitted portion of the pre-existing private road, which increased his estimate by about 1/10th of an acre, an amount not significant enough to impact on the legal analysis contained in this decision.

proposed Pierce Woods private roadway follow along a pre-existing private trail used by walkers and ATV riders.

18.    The common lot boundary in the proposed two-lot subdivision follows generally along an unnamed stream that meanders in a general north/south direction; the boundary follows this stream from Lewis Creek in the south, to the borders of the Schumacher property. Applicants propose to maintain a fifty-foot buffer along Lewis Creek and the unnamed tributary, which buffer is within the conservation easement area of Lots 18 and 21.

19.    The 113± acre parcel also contains Class 2 and Class 3 wetlands, all as depicted on Exhibit 1. Applicants have designed the PRD such that no development will encroach into these wetlands, or into a fifty-foot buffer from the edge of such wetlands.

20.    Portions of the 296± acre parcel contain fertile agricultural soils that were once used in the operation of the former Pierce farm. Much of the land that remains open today, thereby retaining a potential for use as agricultural soils, is located on the remainder parcel that is not currently proposed for development. Portions of Lots 1 and 2 also contain open areas that were once used for agricultural purposes. The building envelopes and proposed home sites are sited in such a manner so as to preserve most of the open areas of these parcels and protect such areas from further development.

21.    None of the proposed dwelling units or buildings will exceed the 35-foot height limitation of all three zoning districts.

22.    All proposed buildings sited on lots on the perimeter of the proposed subdivision are set back at least 50 feet from the exterior boundary lines.

23.    Applicants have proposed landscaping, trees and other screening where necessary along the perimeters of the proposed subdivision, all as shown on Exhibit 1.

24.    Lot 22 will be held as common land, upon which a community waste water disposal system will be constructed pursuant to applicable state and municipal waste disposal permits. Lot 22 lies on either side of Pierce Woods Road, and actually includes the land over which the sixty-foot easement will run that will serve all other lots, the Pidgeon property and the Schumacher property. Lot 22 is also encumbered by a sixty foot easement that runs easterly from Pierce Woods Road to the adjoining Pierce remainder parcel. This easement is identified on Exhibit 1as being "for possible future road & utilities to remaining land."

**Discussion**

As with all de novo appeals to this Court, the issues over which we have jurisdiction in this appeal are identified by Appellants' Statement of Questions. V.R.C.P. 5(f); 10 V.S.A. § 8504(h). Issues not preserved by an appellant's statement of questions are outside this Court's jurisdiction; they have become the law of the case by virtue of not being appealed. In re Appeal of Jolley Associates, 2006 VT 132 ¶ 9, citing In re Garen, 174 Vt. 151, 156 (2002). Thus, we turn our focus, not to the application generally, but to the portions of the Planning Commission's approval of the PRD application that were preserved for our review by Appellants' Statement of Questions. Those Questions are fourteen in number and fall into the following six general areas of concern:

**1.  Does the proposed PRD satisfy the Bylaw definition?**

By his Question 1, the remaining Appellant questions whether the proposed subdivision satisfies the very definition of a "Planned Residential Development" ("PRD") in the Ferrisburgh Zoning Bylaws ("Bylaws"), which provides that a PRD is:

> An allowed method of land development for residential use. An area of land to be developed as a single entity for a number of dwelling units, the plan for which does not conform to the zoning regulations established for the district in which it is proposed to be located. The permitted number of dwelling units shall not exceed the number which could be permitted if the land were subdivided into lots in conformance with the zoning regulations. Dwelling units may be clustered to take advantage of site locations best suited for development and to preserve open space values. See Section 4407(3) of the [former title 24[7]] for a more complete description of PRD's.

> Bylaws § 2.2

Appellant does not dispute that the proposed subdivision is a single, unified subdivision that only proposes residential uses, and that the lot configuration does not conform to the applicable zoning district regulations. Thus, the evidence presented leads us to conclude that the proposed subdivision conforms to the first two sentences of the basic definition for PRDs contained in Bylaws § 2.2.

Applicant provided its engineer at trial to show that the proposed subdivision was not seeking approval for the creation of more lots in its proposed PRD than would be allowed by the

---

[7]  At the time Bylaws § 2.2 was drafted, the authority of Vermont towns to approve PRDs derived from 24 V.S.A. § 4407(3). With the revisions to title 24 accomplished by the Permit Reform Act of 2004, the authority for PRDs is now derived from 24 V.S.A. § 4414. The former 24 V.S.A. § 4407(3) controls in this proceeding.

Bylaws, if the subdivision were to conform with all applicable district regulations. Applicant's engineer based his calculations of the number of lots that would be allowed in a conventional subdivision by relying on the undisputed estimates of the number of acres in each of the zoning districts encompassed by the 113± parcel. We have adopted those acreage estimates in our Finding 14, above.

We conclude that to meet the basic definition of a PRD in Bylaws § 2.2, an applicant need only show what number of dwelling units the applicable district regulations would allow if a conventional subdivision were proposed. Thus, we conclude that with 18.2 acres in the RR-2 District, which requires lots to be no less than 2 acres in size, a conventional subdivision could accommodate up to nine dwelling units; with 61.2 acres in the RA-5 District, which requires lots to be no less than 5 acres in size, a conventional subdivision could accommodate up to twelve dwelling units; and with 33.3 acres in the Con-25 District, which requires lots to be no less than 25 acres in size, a conventional subdivision could accommodate one dwelling unit. Thus, solely for purposes of our determination of compliance with the basic definition for PRDs in Bylaws § 2.2, Applicant must limit its proposal to no more than 22 dwelling units. Since Applicants' proposal is to develop a PRD with 21 developed lots,[8] we conclude that the proposed PRD subdivision complies with Bylaws § 2.2.

We note that a subsequent provision in the Bylaws—Bylaws § 5.21(C)(2)—requires a more skillful analysis of the number of allowable dwelling units in each zoning district. That latter provision requires that our calculations deduct for "the area within the boundaries of any proposed road." We discuss compliance with Bylaws § 5.21(C)(2) at pages 11–13, below. This portion of our discussion focuses solely upon compliance with the PRD definition of Bylaws § 2.2, which we find to be a very basic starting point in the Ferrisburgh Zoning Bylaws.

Appellant suggests that Applicants have failed to satisfy the definitional requirements for a PRD because they have not put forth a specific plan for a convention subdivision. We do not read Bylaws § 2.2 as imposing such a requirement on an applicant; we read the definitional requirements for a PRD as much more basic under Bylaws § 2.2. This definition is a starting point for any analysis of a proposed PRD in Ferrisburgh. Interpreting § 2.2 as requiring a PRD applicant to first present detailed plans of a conventional subdivision, one that the applicant

---

[8] We note that both Bylaws §§ 2.2 and § 5.21(C)(2) direct our focus to "dwelling units" and not to the number of lots proposed. Thus, while the proposed subdivision could be described as containing 22 lots, one of which will be common land, we conclude that the more accurate description for the proposed development is a 21-lot PRD subdivision.

never intends to pursue, is not supported by the language of Bylaws § 2.2 and would place an unreasonable burden on property owners seeking to develop their property.

Zoning regulations represent the legitimate use of a municipality's authority to determine its character, but because zoning regulations are in degradation of a property owner's rights, we are instructed to read such regulations narrowly. See Committee to Save Bishop's House, Inc., 137 Vt. 142, 152 (1979) ("The court's true function is to give effect to the legislative intent, and in this endeavor, we are guided by rules of general applicability, evolved through long judicial experience. One of these is that legislation in derogation of common law property rights will be strictly construed."). We decline to read Bylaws § 2.2 so broadly as to require a PRD applicant to first present a detailed plan of a conventional subdivision, merely to evidence the dwelling unit limitation. The language of Bylaws § 2.2 is satisfied by a mere mathematical computation, as was completed by Applicants' engineer at trial.

**2.      Compliance with purpose provisions.**

Appellant next challenges, by his Question 2, whether the proposed PRD subdivision conforms to the applicable purpose provisions of the Bylaws: § 5.21(A). Each party provided a helpful, detailed analysis of § 5.21(A), both at trial and in their post-trial filings. But we note that we must first determine if such analysis is proper, given the nature of Bylaws § 5.21(A). We conclude that it is not.

Purpose provisions in zoning regulations are necessary and helpful because they often provide a guide for interpretation and enforcement of regulatory provisions in an ordinance. But the purpose provisions are not in themselves regulatory in nature. See In re Meaker, 156 Vt. 182, 185 (1991) (a "purpose statement . . . has no direct regulatory effect."), citing Kalakowski v. John A. Russell Corp., 137 Vt. 219, 225 (1979). Thus, while § 5.21(A) provides guidance for our analysis of whether the proposed PRD conforms to the regulatory provisions of § 5.21, it is improper for the Planning Commission in the first instance or this Court on appeal to determine "conformance" with this purpose provision. We therefore dismiss Appellant's Question 2, since § 5.21(A) contains no regulatory language, but fulfills an effective purpose of guiding our review of the other Bylaws provisions that are regulatory in nature.

**3.      Compliance with PRD procedural requirements.**

Appellant preserved for our review in this appeal, via his Question 3, the issue of whether the Applicants satisfied the procedural requirements for PRD applications found in Bylaws

§ 5.21(B).  This section is short and succinct; it requires an applicant to "provide a written statement setting forth the nature of all proposed modifications, changes or supplementations of existing zoning regulations," with specific reference to the "major subdivision application and approval procedures."

Applicants fulfilled the requirements of Bylaws § 5.21(B) by submitting their engineer's narrative written statement (Exhibit 4).  Included in that written statement was the Applicants' itemization of the six requested waivers from the district regulations Applicants were seeking for their proposed PRD subdivision.  With this submission, Applicants fulfilled the requirements for compliance with Bylaws § 5.21(B).

Appellant suggests that the waivers or modifications allowed by Bylaws § 5.21(B) provides "standardless discretion" and are therefore unconstitutional and unenforceable.  If the Bylaw provisions do not, in fact, provide appropriate standards to guide the exercise of discretion on whether to allow the requested waivers and approve the proposed PRD, then Appellant's constitutional argument would succeed.  However, we find that Bylaws §§ 5.21(C) and § 5.21(D) provide both general and specific standards, respectively, that guide this Court in determining whether to, in its discretion, allow the waivers necessary to approve the proposed PRD.

In Town of Westford v. Kilburn, 131 Vt. 120, 124–25 (1973), one of the two cases Appellant relies upon, a bylaw was successfully challenged that essentially allowed an applicant's neighbors to exercise unbridled veto power over a proposed change of use.  The passage quoted by Appellant continues with a further clarification: "On one hand the standards governing the delegation of such authority should be general enough to avoid inflexible results, yet on the other hand they should not leave the door open to unbridled discrimination."  In re Paul Handy, 171 Vt. 336, 345 (2000), quoting Kilburn, 131 Vt. at 225.

The general and specific standards of Bylaws §§ 5.21(C) and § 5.21(D) give an applicant, and all other interested persons, sufficient notice of the factors we must consider in reviewing a PRD application, while at the same time providing sufficient discretion so as to not be guilty of the inflexibility that Kilburn and Handy cautioned about.  We conclude that the waiver provisions of Bylaws § 5.21(B) do not suffer from the constitutional infirmities that Appellant suggests.

Applicants note in their post-trial memoranda that Appellant "presented no evidence or testimony at the hearing on this section of the ordinance."  The Court's recollection, aided by its trial notes, confirms this point.  But this is a point that must be put in context with a brief

discussion of the burden of proof and which party bears the respective burdens in Environmental Court appeals.

De novo appeals to this Court require a new hearing as to those issues preserved for our review on appeal, one which must occur as if the proceeding appealed from never occurred. 10 V.S.A. 8504(h); see also V.R.E.C.P. 5(g) and In re Green Peak Estates, 154 Vt. 363, 372 (1990) (noting that "all of the evidence [on the appealed issues] must be heard anew"), citing in part In re Poole, 136 Vt. 242, 245 (1978).

Section 8504(h) of title 10 also requires that in administrating a de novo hearing, this Court must apply "the substantive standards that were applicable before the tribunal appealed from." Our Rule 5(g) mirrors this directive. We interpret this directive to include both a requirement as to which municipal regulations control our determination and which party carries the initial burden of production and the subsequent burdens of persuasion. In this regard, we conclude that when a municipal permit is subject to our review in a de novo appeal, the applicant must first present evidence that its proposed project complies with the applicable zoning provisions preserved for our review in this appeal. Once the applicant fulfills that initial burden of production, the burden of persuasion shifts to the party opposing the project. This Court may only approve a municipal application in a de novo appeal when it is convinced that the proposed project complies with the applicable zoning provisions. Thus, the applicant retains the final burden of persuasion.

In this context, a neighbor who appeals a municipal determination on another's application does not carry the initial burden of production. If that neighbor offers no evidence to refute the testimony in support of the project, the appeal may prove unsuccessful. But the neighbor is under no obligation to submit independent evidence of non-conformance; the neighbor's prosecution of their appeal may rely solely on a questioning of the sufficiency of the applicant's evidence.

## 4. Compliance with PRD General Requirements.

Ferrisburgh has established both general and specific standards that must be met before its Planning Commission in the first instance, and this Court on appeal, may approve a PRD application. These general and specific standards provide guidance to the reviewing entity as it seeks to determine whether and to what extent it should exercise its discretion in waiving the requirements of the applicable zoning district regulations, as directed by the introductory provisions of Bylaws § 5.21:

In accordance with the provisions set forth in [the former 24 V.S.A. §] 4407(3) . . ., and in those districts in which residential uses are allowed, the modification of the district regulations by the Planning Commission [or this Court on appeal, see 10 V.S.A. § 8504(h)] is permitted simultaneously with approval of a site plan under the following procedures:

Subsection (C) provides the general standards of review under Bylaws § 5.21; Subsection (D) provides the specific standards. We first address the general standards that Appellant preserved for our review in this appeal in his Questions 4, 5, 6 and 7.

### Consistency with municipal plan (§ 5.21(C)(1); Question 4)

The first general standard directs that a proposed PRD be consistent with the municipal plan. Bylaws § 5.21(C)(1). Applicants provided detailed analysis on this point, both through the testimony of their engineer and the Town Planner. Appellant suggests that the proposed PRD is inconsistent with the municipal plan's stated goals of (a) preserving "farmland and other natural resources" (Town Plan Goal 1.4) and (b) encouraging "village-type development through the use of Planned Residential/Unit Developments." We disagree.

Determining consistency with a town plan often involves subjective determinations. One person's "sprawl" can be another person's appropriate cluster development. As noted in a bit more detail below (see the discussion of compliance with Bylaws § 5.21(C)(4)), we view the design of the propped PRD as taking sufficient steps to preserve some of the forest and agricultural soils, while still allowing for the placement of dwelling units in clusters near the two loops along Pierce Woods Road. The Class 2 and 3 wetlands, as well as a buffer of at least fifty feet surrounding them, will be protected from development, now and into the future. Further development of the 113± acre parcel would be prohibited.

The adjoining neighbors, including Appellant, will witness changes to their neighborhood, both during construction and once this PRD development is completed. But once completed, the proposed PRD will preserve much of the agricultural soils, wooded areas and all of the wetlands and their buffers. We find no evidence that the proposed PRD conflicts with the stated goals in the Town Plan; the admitted evidence we find most compelling leads us to the conclusion that the proposed PRD is consistent with the Town Plan.

### Compliance with overall density standard (§ 5.21(C)(2); Question 5)

Bylaws § 5.21(C)(2) directs that a PRD may only be approved when it is shown to not have a density in excess of "the number of dwelling units which could be permitted, in the

Planning Commission's judgment, if the land (excluding the area within the boundaries of any proposed road) were subdivided into lots in accordance with the district regulations."[9]

Our analysis under this general standard is similar to our analysis under § 2.2, above, but is different in two regards: first, that our calculations must exclude the acreage "within the boundaries of any proposed road;" second, that the Planning Commission (or this Court in the event of an appeal) is directed to use its "judgment." We take these issues in turn.

The density determination here will determine whether the Bylaws allow for the 113± parcel to contain 20 or 21 dwelling units, based upon what we determine to be the boundaries of the road. The Town Planning Coordinator and Zoning Administrator revealed through her testimony at trial that while PRDs with undersized lots have been approved under Bylaws § 5.21(C), this case may be the first where a specific challenge to a proposed PRD subdivision has been based, in part, on this provision. There was no guidance offered at trial on how to interpret the language of § 5.21(C)(2) by either Applicant or Appellant, other than a reference to the plain language of the Bylaw.

Our determination of what the legislative intent is of the phrase "boundaries of any proposed road" is mostly guided by the very words in the Bylaw. First, we are directed to limit our calculations to roads "proposed" in the application. The uncontroverted evidence at trial by Applicants' engineer showed that adding in the pre-existing private roads on the 113± acre parcel only increased the road acreage by $1/10^{th}$ of an acre; an amount not significant enough to affect the outcome of our analysis.

Applicants suggest that § 5.21(C)(2) directs that we subtract from the total acreage only the road itself, that is, the traveled portion of the proposed roadway. If we were to adopt this determination, it is unrefuted that the calculations would allow for 21 dwelling units in the proposed PRD.[10] Appellant suggests that § 5.21(C)(2) requires that we subtract from the total acreage the total area of the easement upon which the road is to be placed. If we were to adopt this determination, it is unrefuted that the calculations would allow for only 20 dwelling units on the 113± acre parcel, resulting in a denial of the PRD subdivision as proposed.

---

[9]  Section 5.21(C)(2) continues with the phrase "and other relevant provisions of these bylaws." Since Appellant directs our attention solely to the district regulations regarding dwelling unit density, and there is no assertion that Applicants' suggested density contradicts any other Bylaws provision, we limit our analysis to the above.

[10]  As noted in our analysis under Bylaws § 2.2, we conclude that neither Bylaw provision requires that an appellant put forth a complete plan for a conventional subdivision, merely to complete these density calculations.

We conclude that the road boundary calculation proposed by Applicants more closely adheres to the intent of § 5.21(C)(2), as applied to the facts of his case.  First, we note that the entire proposed easement includes a traveled portion of the roadway of about 20 feet wide, with ditching and undisturbed areas of about 40 feet wide (i.e.: approximately 20 feet on each side of the roadway), plus large loops in the roadway, within which will be oval areas of undisturbed or landscaped land.

Appellant cites two cases for the proposition that Bylaws § 5.21(C)(2) directs that we include the entire easement area in our calculation of the road boundary: MacDonough Point Corp. v. Field, 109 Vt. 25 (1937) and Lefebvre Adv. V. Central Vt. Railway Co., 97 Vt. 342 (1924).  Neither case is controlling, as neither speaks to the interpretation of a municipal regulation.  In fact, both speak to the right of the public to use the entire easement area, not just the portion marked for travel.[11]

We presume that if the drafters of Bylaws § 5.21(C)(2) wished to have the entire easement area excluded from the density calculations, they could have easily drafted the provision to say so.  Instead, they chose to reference the road "boundaries," which we conclude is commonly understood to mean the identifiable boundaries of the road itself, and not the wider, sometimes unidentifiable boundaries of the easement or right-of way.

In reaching this conclusion, we understand that our Supreme Court has directed that in some instances, particularly those related to undersized lots, the entire public highway easement area must be subtracted from the lot to determine the area available for development.  See In re Appeal of Bailey, 178 Vt. 614, 618 (2005).  However, particularly in light of the discretion afforded to the Planning Commission in the first instance, and this Court on appeal, by the directive in § 5.21(C)(2) to use its "judgment," we conclude that the Bylaw only directs us to subtract the actual width of the proposed roadway, and not the entire easement area, from our density calculations.  Having done so, we conclude that the remaining land would allow a conventional development that would accommodate up to 21 dwelling units.  Thus, the proposed PRD is in compliance with Bylaws § 5.21(C)(2).

---

[11] The MacDonough case provides some coincidence and intrigue, as it involves a trespass alleged upon other lands in Ferrisburgh, albeit that originated in 1934.  Defendants traveled over a public right-of-way to a beach area on Lake Champlain.  Plaintiff appeared to be most upset, not by defendant's use of the right-of-way for access, but by his repeated parking within the right of way limits to swim, sometimes nude, with others along the Ferrisburgh shores of Lake Champlain.  Lefebvre was an accident case between an auto and a train, allegedly caused by a wall constructed by the rail company within the 4-rod wide highway right-of-way.  The precedent on the law of trespass in these two cases does not appear to control our interpretation here of Bylaws § 5.21(C)(2).

**Plan Effectiveness & protection of natural features (§ 5.21(C)(4); Question 6)**

The 113± parcel presents some design challenges and contains some areas of natural beauty, including Class 2 and 3 wetlands, wooded areas, some steep slopes, and agricultural soils. The remainder parcel, while not subject to the development proposals presented in the PRD application, also contain large areas of agricultural soils used in the operation of the former Pierce farm.

Applicants have designed the proposed PRD such that these natural areas are protected, both from the development currently proposed and from future development or subdivision. Most of the agricultural soils on Lots 1 and 2 will remain open. The treatment of these open portions will allow for a minimal interruption of the natural beauty of this area, while still providing for the accommodation of the same number of dwelling units that a conventional subdivision would allow. The clustering of dwellings around to two large loops included in the proposed private roadway results in an effective and unified treatment of the development possibilities for this parcel. We therefore conclude that the proposed subdivision is in compliance with Bylaws § 5.21(C)(4).

**Siting and orientation of proposed buildings (§ 5.21(C)(6); Question 7)**

The proposed private roadway (Pierce Woods Road) is orientated in a general north/south direction, which encourages the orientation of the 21 proposed dwellings to the southeast, south, and southwest directions, so as to be in compliance with Bylaws § 5.21(C)(6). Applicants' engineer estimated that no building will cast shadows on any other in the development. These orientations allow for the dwellings to best receive sunlight, as well as their possible use of solar energy collectors. We thus conclude that the proposed PRD is in conformance with Bylaws § 5.21(C)(6).

**5.      Compliance with PRD Specific Requirements.**

**Height and spacing limitations (§ 5.21(D)(1); Question 8)**

None of the proposed dwellings will exceed the 35-foot height limitation contained in the applicable district regulations. We are uncertain as to what is meant by the phrase "spacing between main buildings;" we assume that the phrase concerns the spacing between residential buildings, as these provisions regulate planned residential developments. But no dimensional requirement specifically regulating "spacing between main buildings" is contained in the RR-2, RA-5 or Con-25 Districts regulations.

We presume that if the drafters of § 5.21(D)(1) meant to refer to side yard set backs, they would have done so. Given that zoning regulations are a degradation of private property rights and therefore should be read narrowly, Save Bishop's House, Inc., 137 Vt. at 152, we cannot infer that the side yard setback restrictions in the district regulations were meant to be read as "spacing between main buildings." Thus, we conclude that the proposed PRD is in conformance with our interpretation of Bylaws § 5.21(D)(1).

### Perimeter privacy (§ 5.21(D)(2); Question 9)

The proposed PRD incorporates adequate screening, as depicted on Exhibit 1; all proposed buildings near the PRD perimeter are set back at least 50 feet from the PRD's exterior boundary lines, so as to ensure adequate privacy for existing or proposed uses adjacent to the PRD. The proposed PRD is in conformance with Bylaws § 5.21(D)(2).

### Acreage "associated with" each dwelling unit (§ 5.21(D)(4); Question 10)

The language of Bylaws § 5.21(D)(4), read in context with the other Bylaw provisions relating to PRDs, has provided the most vexing legal question for this Court. The operative language states that:

> Each dwelling unit shall have a minimum two acre lot exclusively associated with it and must comply with the specific standards set forth in Section 4.1 [i.e.: the RR-2 District regulations] and 4.2 [i.e.: the RA-5 District regulations] of these bylaws, excluding the lot depth requirement.

The language of Bylaws § 5.21(D)(4) appears clear and unambiguous, until one attempts to reconcile it with the language of Bylaws §§ 2.2 and § 5.21 generally. If a PRD is permitted in the residential districts of Ferrisburgh, such that it "does not conform to the [district] zoning regulation," as defined in § 2.2, and that this "modification of the district regulations" is permitted, so long as the general and specific standards of §§ 5.21(C) and § 5.21(D) are met, how can we interpret § 5.21(D)(4), as Appellant would have us do, as insisting that the specific lots be a minimum of two acres in size and comply with all specific standards of the district regulations, "excluding the lot depth requirement"?

When attempting to interpret part of an ordinance, we are directed to "give effect to the whole and every part of the ordinance." In re Stowe Club Highlands, 164 Vt. 272, 279–80 (1995), citing In re Vermont National Bank, 157 Vt. 306, 312 (1991). In our search for continuity in the Bylaws regulating PRDs in Ferrisburgh, we conclude that § 5.21(D)(4) must be read to complement the beneficial purposes of PRDs expressed in the other provisions of § 5.21.

In order to "encourage preservation of forestry and agricultural land" (§5.21(A)), the "clustering" of dwelling units is allowed, including on lots that do "not conform with the [district] zoning regulations." Bylaws § 2.2.

If Applicants' proposed subdivision was required to have dwelling units actually sited on lots of two acres or more, the ability to preserve large tracts of forest and agricultural lands would be difficult, if not impossible. Conversely, if we read all provisions of § 5.21 in unison, so as to allow the clustering of dwelling in central areas, in order to preserve large tracts on forest or agricultural lands, the expressed goals of the Ferrisburgh PRD provisions can be met. We therefore interpret § 5.21(D)(4) as allowing the clustering of dwelling on undersized lots, to further these stated goals, so long as at least 2 acres of land is "exclusively associated" with the dwelling unit. This directive is accomplished by the allocation evidenced in Exhibit 2.

Appellant's analysis on this point is persuasive, but we believe it leads to an interpretation of § 5.21(D)(4) that would be in conflict with the other Bylaw provisions regulating PRDs. Were we to conclude, as Appellant suggests, that each dwelling unit in a PRD located in either the RR-2 or RA-5 Districts must be physically located on an individual lot of two acres or more, and that no deviation in the zoning regulations should be allowed, a PRD in Ferrisburgh would look no different than a conventional subdivision. The encouragement of forest and agricultural land preservation would be non-existent. See 24 V.S.A. § 4407(3). Such an interpretation would defeat the entire legislative purpose of a planned residential development. We decline to adopt such an interpretation and find that Applicants' allocation of conservation easement acreage, as depicted on Exhibit 2, conforms with Bylaws § 5.21(D)(4)

**PRD total minimum acreage and lot coverage (§ 5.21(D)(5); Question 11)**

The entire area of this PRD exceeds the 25-acre minimum of Bylaws § 5.21(D)(5); the undisputed evidence is that as much as 76% of the proposed PRD is designed to remain undeveloped and not subject to further subdivision. Applicants offer assurance of this representation by way of a general description of the conservation easements they intend to put in place on Lots 1, 2, 17, 18 and 21. In reliance upon Applicants' representations, we will condition our approval of the PRD upon Applicants' submission of the specific conservation easements they intend to convey to the Vermont Land Trust or similar entity. Once approved, no material revisions to the conservation easements may occur without the Applicants, their successors or assigns receiving approval for such easement revisions from the Planning Commission. Thus, we conclude that the PRD is in conformance with Bylaws § 5.21(D)(5).

## 6.      Compliance with subdivision General Requirements & Design Standards.

Appellant's final challenges (Questions 12, 13 and 14) question whether the proposed PRD conforms with the planning standards of Article IV of the Ferrisburgh Subdivision Regulations ("Regulations") generally, and whether it conforms with the specific planning standards of Regulations § 410.1 (Character of Land) and § 410.5 (Preservation of Existing Features). We take on the review of the specific provisions first.

Section 410.1 requires a determination, "in the judgment of" this Court, of whether the development of the 113± acre parcel will pose a "danger to public health or safety, or to the environment." This provision continues with a caution: "Land subject to periodic flooding, poor drainage, inadequate capability to withstand structures, including streets, utilities, and buildings, or other hazardous conditions, shall not ordinarily be subdivided." There was no evidence admitted at trial that suggested that the 113± acre parcel suffered from these conditions. To the contrary, the evidence presented at trial tended to show that the proposed PRD would be completed in a manner that would not jeopardize public health or safety. The manner in which the PRD was planned respects wetlands and their buffers.

Section 410.5 directs that "due regard shall be given to the preservation and protection of existing features, trees, scenic points, brooks, streams, rock outcroppings, water bodies, other natural resources and historic resources." For all the reasons stated above, we conclude that the proposed PRD gives due regard to such important existing features and natural resources.

The 113± parcel may contain some historic or archeological sites. Appellant has caused such sites to be mapped and preserved from development.

The remaining planning standards in Regulations Article IV relate to energy conservation measures (§ 410.2); prohibition on private reserved strips (§ 410.3); and conformance of the lot layout to the zoning regulations (§ 410.4). The admitted evidence revealed that the proposed PRD conforms to all planning standards of Regulations Article IV.

### Conclusion

For all these reasons, we conclude that Applicants' proposed 21-lot PRD subdivision conforms to all provisions of the Ferrisburgh Zoning Bylaws and Subdivision Regulations that were preserved for our review in this appeal. We therefore **APPROVE** Applicants' subdivision and PRD applications, subject to the following:

1. Applicants shall submit a complete site map to the Ferrisburgh Zoning Administrator, evidencing the exterior boundaries of the remainder parcel, Lot 18 and Lot 21;

2. This approval is conditioned upon no further subdivision of the 113± acre parcel;

3. No development or further subdivision of the remainder parcel shall occur without approval being obtained from the appropriate state and municipal panels;

4. This matter is remanded to the Ferrisburgh Zoning Administrator for compliance with the terms and conditions of this Decision and the unappealed provisions of the Ferrisburgh Planning Commission Decision of January 24, 2006;

5. No development or sale of the approved lots shall occur until Applicants have submitted the specific conservation easements, deed restrictions and homeowners' association bylaws (including road maintenance provisions) to the Zoning Administrator and have received confirmation from the Zoning Administrator that such documents conform to the applicable terms of both Decisions. In reviewing the draft documents submitted by the Applicants, the Zoning Administrator may seek out the guidance and assistance of the Town attorney. No material revisions to the conservation easements, deed restrictions and homeowners' association bylaws (including road maintenance provisions) may occur without the Applicants, their successors or assigns receiving approval for such revisions from the Planning Commission.

This completes the current proceedings on this appeal before this Court; the matter is now concluded. A Judgment Order accompanies this Decision.

Done at Berlin, Vermont this 28th day of February, 2007.

_____
Thomas S. Durkin, Environmental Judge

*18*