## In re John Meaker, et al.

[588 A.2d 1362]

No. 89-049

Present: **Allen, C.J., Peck, Gibson, Dooley and Morse, JJ.**

Opinion Filed March 1, 1991

*Biggam & Fox,* Montpelier, for Appellants Fox.

*Valsangiacomo, Detora, McQuesten, Rose & Grearson,* Barre, for Appellants Laundon, et al.

*Steven F. Stitzel* of *McNeil & Murray,* Burlington, for Appellees.

**Allen, C.J.** Residents of the Town of Waterbury appeal the trial court's issuance of a conditional use permit for the operation of a gravel pit on applicants' property. We reverse.

The basic facts are not in dispute. Applicants Thomas W. Meaker, John P. Meaker, and Nancy B. Laird are co-owners of a parcel of land containing approximately 260 acres south of what is known as Perry Hill Road in Waterbury. They proposed to extract sand and gravel from a 10.2-acre portion of their property, and filed an application with the Town for approval under its zoning regulations. Such approval was required because Town of Waterbury Zoning Bylaws (bylaws) § 11.2 authorizes sand and gravel activities only as a conditional use.[1] The Zoning Board of Adjustment (ZBA) approved the application after a hearing on September 18, 1984, and granted the permit. Appellants filed timely notices of appeal and, after hearing, the Washington Superior Court on March 21, 1987, ordered a remand to the ZBA. After an appeal of that superior court order to this Court was dismissed by stipulation, the matter was remanded

---

[1] A prior superior court decision, which was not appealed, determined that the proposed use should be treated as a conditional use.

to the ZBA under the original superior court order, and the ZBA again granted the permit. A second appeal was timely filed in the Washington Superior Court, and a de novo trial was conducted on July 7 and 8, 1988. On December 19, 1988, the court granted applicants a permit.

The court concluded that the proposed project met all of the criteria set forth in § 4.4(2)(A) of the bylaws and granted a permit with conditions that limited the pit's operation to between 8:00 a.m. and 4:00 p.m., Monday through Friday, and prohibited operation during the period from November 1 to April 15 of each year. Further, the permit limited the rate of extraction to ten loads of material per day. The present appeal is from that order.

Appellants argue that the trial court erred in concluding that the project met the requirements for a conditional use either under 24 V.S.A. § 4407(2)[2] or § 4.4(2)(A) of the bylaws.[3] They contest the court's conclusion on all four of the stated criteria under § 4.4(2)(A).

■■ The trial court's findings "are to be so read as to support the judgment if they reasonably may be." *First Vermont Bank & Trust Co. v. Village of Poultney*, 134 Vt. 28, 35–36, 349 A.2d 722, 728 (1975). We read the findings to support the judg-

---

[2] 24 V.S.A. § 4407(2) states in relevant part:
  (2) **Conditional uses.** In any district, certain uses may be permitted only by approval of the board of adjustment, if general and specific standards to which each permitted use must conform are prescribed in the zoning regulations and if the board of adjustment after public notice and public hearing determines that the proposed use will conform to such standards. Such general standards shall require that the proposed conditional use shall not adversely affect:
    (A) The capacity of existing or planned community facilities;
    (B) The character of the area affected;
    (C) Traffic on roads and highways in the vicinity;
    (D) Bylaws then in effect; or
    (E) Utilization of renewable energy resources.

[3] Section 4.4(2)(A) provides as follows:
  Prior to granting any approval the Board shall determine that the proposed use will conform to the following general standards:
    (A) The proposed conditional use shall not adversely affect:
      1. The capacity of existing or planned community facilities.
      2. Traffic on roads and highways in the vicinity.
      3. The character of the area affected.
      4. Bylaws then in effect.

ment as to § 4.4(2)(A)(1), (3) and (4). First, we agree with the trial court's conclusion that "community facilities" within the meaning of § 4.4(2)(A)(1) included only "water supply, sewage disposal, fire protection, school services, recreation facilities, solid waste facilities or police protection" and did not include roads or highways. See *Lakeland Parks, Inc. v. Washington Township*, 147 N.J. Super. 528, 537, 371 A.2d 762, 766 (1977) (road or street is not normally defined as a municipal facility within meaning of ordinance).

■ Appellants next argue that the trial court erred in failing to conclude that the proposed project would not adversely affect the character of the area, under § 4.4(2)(A)(3) of the bylaws. Appellants rest their argument on the court's findings that the general area is residential in character and that the roads in the vicinity are used for jogging, walking, horseback riding, and biking. But those findings do not compel a conclusion that the character of the area will be adversely affected, and the court's contrary conclusion is not clearly erroneous. See *A. Brown, Inc. v. Vermont Justin Corp.*, 148 Vt. 192, 194, 531 A.2d 899, 901 (1987).

■ Appellants also mount a general attack on the proposed project as inconsistent with the town's bylaws, within the meaning of § 4.4(2)(A)(4), since § 6 of the bylaws states within its general purposes the desire to "preserve the best possible environment for residential development." However, the purpose statement of the bylaws has no direct regulatory effect. See *Kalakowski v. John A. Russell Corp.*, 137 Vt. 219, 225, 401 A.2d 906, 910 (1979) (town plan is "advisory"). Appellants' other arguments that the proposed project offends the town's bylaws are without merit.

Appellants, however, do raise serious concerns about the consistency between the trial court's findings and its conclusions with respect to the proposed project's effect on roads and highways in the vicinity within the meaning of § 4.4(2)(A)(2). Several findings indicated that the impact of the proposed project on traffic would be significant. While we have concluded that roads are not "community facilities" and that § 4.4(2)(A)(1) is not violated by the proposed project, it is clear that the condition of a road or highway can affect its capacity and the amount and

speed of the traffic that it can sustain. Hence, there is a relationship between the impact of a project on roads and highways and its impact on the traffic on those roads and highways.

The court found that the roads that would service the gravel trucks were beset by numerous problems. Finding 11 stated:

> 11. Vehicles traveling to or from the pit will use a road network consisting primarily of Route 100, Stowe Street and Lincoln Streets in the Colbyville area of Waterbury, Perry Hill Road, Kneeland Flats Road, and Guptil Road from its intersection with Kneeland Flats Road southward to its intersection with Route 100. None of these roads are posted for speeds less than 50 miles per hour. However, most of them are not safe for speeds in excess of 35 miles per hour. Loaded trucks weighing 68,000 pounds are allowed by the Town of Waterbury on town highways.

The court described the affected roadways as "20 to 21 feet in width with non-existent shoulders for the most part. All affected roadways, except Perry Hill road, are paved. However, much of the pavement is in poor condition." The court added that in light of the "narrowness of the roads, the sharpness of the curves and the steepness of the inclines," it doubted that gravel trucks could safely go faster than 25 miles per hour. The trial court was specific and detailed in its evaluation of the condition of the roadways serving the proposed project:

> 43. The presently existing traffic hazards are due to the nature of the roads, their construction, their maintenance, and their design. It is obvious that the residential development in the area, and on Perry Hill Road in particular, has outpaced the improvement of the public roads serving the area. *No one would seriously disagree that these roads must be widened with appropriate shoulders; that the sharpness of the curves must be softened; and that the steep pitches must be reduced.* The Town of Waterbury will have to address these problems, regardless of what happens in this case. (Emphasis added.)

The court's findings were well-grounded in the testimony concerning traffic. In addition, there was ample testimony that the proposed project would exacerbate the traffic problems by accelerating the deterioration of the roads. Applicants' expert

testified that the impact of one trip by a loaded gravel truck on a paved or gravel road would be the equivalent of 5,000 to 10,000 trips by a passenger car. Appellants' expert stated that the truck traffic would accelerate the rate of deterioration.

However, despite its extensive findings concerning the impact of the project on area traffic, the trial court concluded that the project

> will not adversely affect traffic on roads and highways in the vicinity. While the affected roads admittedly have limitations, the proposed project has been planned with such limitations in mind. By significantly limiting the number of daily truck trips and planning for the routing of such truck traffic, none of the affected roadways will see an unreasonable increase in traffic. (Citation omitted.)

But there is no indication that the limitations imposed by the trial court are significant, given the court's own findings. The pit will be operated between 8:00 a.m. and 4:00 p.m. during workdays, between April 1 and November 15 of each year. Thus, a significant amount of truck traffic will occur on roads simultaneously serving school buses. The roads have sharp pitches and steep curves, lack shoulders, and are not capable, within limits of safety, of handling traffic at legally prescribed speeds. If the court was satisfied that the project has been planned with the limitations of the roads in mind, it was incumbent on the court to specify in its permit conditions what those limitations are. Neither the hours of use, the directions of entry and exit, nor any other conditions recited in the order adequately address the considerable deficiencies of the road system serving the project.

There is no support for the conclusion that loaded 68,000 pound gravel trucks whose speed could not safely exceed 25 miles per hour do not "present a significant hazard on the road network" when the roads are posted for 50 miles per hour and are narrow, hilly, have sharp curves and steep inclines, and are poorly paved or unpaved. While the limitation on the number of daily trips that can be made reduces the statistical odds of accidents occurring, the hazard created by those trips can only be characterized as adverse and significant. We also have serious concerns regarding the efficacy of the daily extraction limit. The applicants will not staff the gravel pit, but rather will rely

on independent haulers for the removal of gravel. At oral argument, the applicants indicated that they intended to incorporate within contracts made with the independent haulers all of the permit conditions and obtain from the independent haulers an acknowledgment of strict compliance. We question how a hauler, let alone the applicants, will be able to ascertain on a given day how many loads have already been removed that day by the aggregate of all of the others with access to the pit. In addition, we fail to see how such an arrangement can safeguard the interests of those not parties to the contract.

■ In sum, the court's findings describe a multitude of adverse impacts on road traffic in the vicinity of the project, and yet the opinion concludes that there will be no adverse impacts. The conclusion is at odds with the court's findings and cannot stand. See *Community Feed Store v. Northeastern Culvert Corp.*, 151 Vt. 152, 159, 559 A.2d 1068, 1072 (1989); *Dartmouth Savings Bank v. F.O.S. Assocs.*, 145 Vt. 62, 66, 486 A.2d 623, 625 (1984). The matter must be remanded for consideration of an order with conditions that will more closely reflect the court's specific traffic concerns or, upon an appropriate showing by applicants, another plan for operation of the proposed project that more adequately addresses the hazards and impediments to traffic that the court has so clearly delineated in its findings.

*Reversed and remanded.*

**Dooley, J.**, dissenting. I concur in the Court's analysis with respect to the construction of the ordinance and the trial court's conclusions on the effect of the project on the character of the area and the consistency of the project with town bylaws. I do not agree, however, that the trial court erred in concluding that the project as approved would not have an adverse affect on traffic on roads and highways in the vicinity. Accordingly, I dissent from the Court's opinion and would affirm.

The heart of my disagreement with the Court lies in the standard of review, a statement of which is strikingly absent from the Court's opinion. If we were a trial court, I could more readily accept the Court's analysis. We are, however, an appellate court that must uphold trial court's conclusions in a zoning case unless they are "clearly erroneous, arbitrary, or capri-

cious." *In re McDonald's Corp.*, 151 Vt. 346, 349, 560 A.2d 362, 364 (1989). That standard of review is now well entrenched. We have applied it recently in review of a conditional use approval, *In re Duncan*, 155 Vt. 402, 409, 584 A.2d 1140, 1145 (1990); in determinations of whether a particular use is an accessory use, *In re White*, 155 Vt. 612, 620, 587 A.2d 928, 932 (1990); in review of a site plan approval, *In re Carrier*, 155 Vt. 152, 159, 582 A.2d 110, 114 (1990); in review of the construction of a zoning ordinance, *Route 4 Assocs. v. Town of Sherburne Planning Comm'n*, 154 Vt. 461, 462, 578 A.2d 112, 113 (1990); and in review of a determination of a preexisting nonconforming use, *Franklin County v. City of St. Albans*, 154 Vt. 327, 331, 576 A.2d 135, 137 (1990). See also *In re Town of Sherburne*, 154 Vt. 596, 603–07, 581 A.2d 274, 278–80 (1990) (applying similar standard in Vermont Water Resources Board proceedings). Another standard is also applicable here. While we require that findings be consistent with conclusions, we "must, if possible, construe the findings so as to support the judgment." *LaFountain v. Vermont Employment Security Bd.*, 133 Vt. 42, 46, 330 A.2d 468, 471 (1974). I do not believe that one can reach the Court's conclusion if these standards of review are applied.

The heart of the Court's position appears to be in the next-to-last paragraph of the opinion. There, the opinion holds, presumably as a matter of law, that heavily loaded gravel trucks, traveling on roads that are "narrow, hilly, have sharp curves and steep inclines" and that should be traversed at only half the speed limit, present a significant hazard on the road network. Further, it concludes that there is no way to police the daily limit on the numbers of loads taken from the pit. Thus, the Court holds that there are adverse impacts as a matter of law, and the trial court's permit conditions fail to eliminate them.

Any development has some adverse impact on traffic conditions. Thus, we must read into the ordinance a concept of reasonableness and give the trial court considerable discretion in drawing that line. See *In re Walker*, 156 Vt. 639, 639, 588 A.2d 1058, 1059 (1991) (mem.) (proper standard in conditional use case is material adverse effect). More important, we are considering the differential impact of the proposed development. The developer is not responsible for current substandard road conditions unless his activities will make them worse to an unreasonable extent.

The applicants' case on the traffic issue was based entirely on the testimony of an expert witness, a civil engineer with experience in road design. This witness testified at length about the road systems and the impact of the project. He acknowledged all the deficiencies in the road system that are cited by the Court and the appellants. He concluded: "[W]ith that intermittent truck traffic, I really do not see a problem with the structural aspect of the road or in fact the safety aspect." Variations of this conclusion are scattered throughout his testimony. Based on this testimony, the court determined that "[g]ravel trucks, as opposed to other motor vehicles, do not present a significant hazard on the road network . . . ." In short, based on the evidence, the court concluded that there would be no significant differential impact from the gravel operation with the limitations imposed upon it. I do not see how the Court can conclude that there "is no support for [this] . . . conclusion."

It is also important to emphasize the importance of the limitations, all based on the expert's opinion. The court limited extraction to ten loads per day, with each load within the limit allowed by the town for the road system. This is approximately one truck trip per hour. Extraction was not allowed on weekends and holidays, nor between November 15th and April 1st, when the roads would be covered with snow or mud. The most important limit was that loaded trucks would exit in only one direction to safely enter and traverse Perry Hill Road. This stemmed from the expert's opinion, based upon an analysis of the structure and condition of the road, that safety required loaded trucks to descend Perry Hill Road only in the direction that exited onto Kneeland Flats Road.

The Court has to ignore the expert's evidence to find, as a matter of law, a conflict between the findings and the conclusions. If I understand the Court's logic, there can never be significant development on substandard roads with speed limits that are too high for the conditions or in a town that sets too high a weight limit for vehicles on its roads. That is far too extreme a position to be a rule of law. Like many rural roads in Vermont, the road in question here has a high speed limit because it is unposted, not because high speeds are safe. As the expert testified here, we must look at the impact of development in light of prevailing speeds, not the maximum imagin-

able. No doubt the town will set an appropriate speed limit when the need becomes apparent. It is not the applicants' responsibility to set that limit. I have a similar reaction to the Court's concern about the weight of the vehicle and its impact on town roads.

Nor am I persuaded by the Court's concern for policing the restrictions, raised at oral argument. Ultimately, the permit conditions can be enforced by enforcement actions since the applicants would, in effect, be operating without a permit. See 24 V.S.A. §§ 4444, 4445. It is preferable to impose clear performance standards, leaving it to the permit holder to create a method to ensure compliance, rather than dictating that method from these chambers. I am confident that the neighbors will be observant of the activities at the gravel pit and will report the presence of any truck traffic above that allowed by the permit.

As our cases indicate, gravel pits are highly controversial, and no land owner wants one to locate nearby. See *In re R.E. Tucker, Inc.*, 149 Vt. 551, 547 A.2d 1314 (1988); *In re H.A. Manosh Corp.*, 147 Vt. 367, 518 A.2d 18 (1986); *In re Orzel*, 145 Vt. 355, 491 A.2d 1013 (1985). On the other hand, a supply of gravel is necessary for road construction and improvement and other desirable purposes. I assume that everyone would agree that locating a gravel pit in a developed and urbanized area would be inappropriate. Under the standards imposed by the Court, it is likely that neighbors could keep a gravel pit out of most rural areas since the quality of road systems is unlikely to be very good where there are few people to use the roads. We are in serious danger of expanding not-in-my-backyard into not anywhere.

I am authorized to say that Justice Morse joins in this dissent.