APR – 4 2011



STATE OF VERMONT
ENVIRONMENTAL COURT

VERMONT
SUPERIOR COURT
ENVIRONMENTAL DIVISION

}
In re Gerlach Parking Area Permit    }    Docket No. 31-2-09 Vtec
(Appeal of Desch, et al.)    }
}

## Decision on the Merits

Appellants Daniel Desch, Christopher Hancock, and Christopher Rohan (collectively "Appellants") have appealed the decision of the City of Montpelier Development Review Board ("DRB") to grant Ralph and Sharon Gerlach ("the Gerlachs" or "Applicants") design review and site plan approval for a five-space parking area on the northern portion of a previously-developed parcel, identified as 7 Baldwin Street and located between Baldwin and Terrace Streets in the City of Montpelier.

The parties made valiant efforts to resolve their disputes through private negotiations. When those efforts did not bring about a resolution, this de novo appeal proceeded to trial, which was completed over the course of four days (July 21–22 and September 16–17, 2010). The parties were thereafter afforded opportunities to file proposed findings and conclusions, and responses thereto. This Merits Decision is issued in an effort to address all outstanding legal issues concerning the appealed application.

Appellants were initially represented in this appeal by Stephen A. Reynes, Esq. and Jesse L. Moorman, Esq., who were later granted leave to withdraw their appearance; Appellants thereafter represented themselves at trial. The Gerlachs have been represented throughout this appeal by James A. Caffry, Esq.; the City of Montpelier ("City") is represented by Amanda Lafferty, Esq.;[1] Interested Person Kenneth Randall appears pro se.

The Court conducted a site visit with the principal parties, prior to the first day of trial. The Court found the site visit to be very helpful, even though statements and observations made during the site visit did not become part of the record and are not considered evidence. Rather, this site visit provided a useful context for the evidence that was received at trial.

---

[1] At the request of the City of Montpelier, and with permission of the Court, Attorney Lafferty only attended the first day of trial.

Based upon the evidence admitted at trial and the legal rulings that determined what facts are relevant to the legal issues that were preserved for this Court's review in this appeal, the Court makes the following Findings of Fact and Conclusions of Law.

## Findings of Fact

### I. General Background

1. Several years ago, Mr. and Mrs. Gerlach completed renovations and improvements to the structures on their property at 7 Baldwin Street ("Gerlach Property"). The main house is now occupied by several professional offices; the garage building on the property includes storage areas and one or more additional offices. Those structures and their renovation and improvements were the subject of prior municipal permit proceedings that are now final; none of those permit proceedings are the subject of the pending appeal.

2. The Gerlach Property also includes a driveway from Baldwin Street that provides access to the buildings. The driveway and adjacent paved area to the east of the main house and in front of the garage provide some parking. However, even with the most efficient parking alignment, the areas adjacent to the driveway provide at most eight parking spaces, which are insufficient parking for the workers who occupy the offices at the Gerlach Property, their guests and business invitees. The Gerlachs therefore decided to apply for authority to construct and maintain an additional parking area on their property.

3. Several other factors influenced the Gerlachs' decision to seek a permit for additional parking on their Property. First, their Property is in the Civic Zoning District ("CIV District") which also encompasses the State of Vermont Capital Complex and all of its facilities, as well as the other public and private facilities and professional offices that are dependent upon the state Capital and its operations. Because of its proximity to the state Capital and related facilities, the Gerlach Property and buildings in its surrounding neighborhood contain many renovated former residences that now house private and public offices.

4. Second, parking in the vicinity of the Capital Complex can be at a premium, especially when both houses of the Vermont Legislature are in session or conducting public hearings. Because of the lack of sufficient public parking, workers and visitors to the Capital Complex are sometimes forced to park on side streets in the CIV District, and in the adjoining Medium Density Residential Zoning District ("MDR District").

2

5.    Because of the scarcity of available parking in the surrounding neighborhood, the Gerlachs decided to apply for a permit to construct and maintain a parking area on their Property. They initially determined that their tenants would best be served by having seven additional parking spaces available on their Property.    As their application progressed through the municipal review process, and due to concerns expressed by their neighbors, the Gerlachs proposed an alternate parking plan, with four spaces aligned together, and a fifth parking space separated by a 12-foot-wide naturally vegetated area.    The Gerlachs requested at trial that this Court approve the alternate parking plan incorporating a total of five parking spaces, as shown on their revised site plan admitted at trial as Exhibit G-RG-14,[2] a reduced copy of which is attached to this Decision for the readers' reference.

II.        Surrounding Neighborhood.

6.    The Gerlach Property presents some particular challenges for siting an additional parking area. The lot appears as a narrow rectangle, with the longer sides of the lot rising from Baldwin Street to Terrace Street.  The buildings on the Gerlach Property are orientated towards Baldwin Street, with an access driveway entering the lot from Baldwin Street.  The area adjacent to Terrace Street, representing the rear of the lot, is wooded and mostly covered by overgrown brush.

7.    The boundaries fronting on Baldwin and Terrace Streets are each 132.0 feet in length. The westerly boundary, which is adjacent to a state office building at 9 Baldwin Street, measures 193.3 feet; the easterly boundary, which is adjacent to a state parking area, measures 171.14 feet.

8.    The state parking lot that abuts the easterly boundary of the Gerlach Property has a gravel area that serves as parking for a number of vehicles; that number was not specifically disclosed at trial.  This parking area is accessed from Hopkins Street, which is a short street that travels between Baldwin and Terrace Streets.  The access to this state parking area is located on Hopkins Street; the access area measures from 45 to 60 feet in width.

9.    There is another state office building (known as 1 Baldwin Street) on the east side of Hopkins Street, next to which is another parking area; the Vermont Statehouse is immediately east of this state building and parking area.

---

[2] Applicants' exhibits contain several consonants: the first denotes that the exhibit was offered by the Gerlachs, the next series of letters identify the witness through whom the exhibit was offered.  Exhibit G-RG-14 was offered during the direct testimony of Ralph Gerlach.

10.     Another, smaller parking area is located along the westerly side of Hopkins Street, near its junction with Terrace Street. The northerly boundary of this parking area includes an area of brush and trees that serves as a partial screen for the parking area, as one looks down into the parking area from Terrace Street.

11.     A private parking area is located just above the area described in ¶ 10, above; this private parking area serves the residence and home occupation located at 1 Hopkins Street, owned and occupied by Christopher Hancock, one of the Appellants here. This private parking area is designed for the parking of one vehicle; a second vehicle has occasionally parked in this area, although without authority from the lessee (Mr. Hancock). A sign is posted in this private parking area, noting that unauthorized use may result in the towing of vehicles.

12.     The terrain on and surrounding the Gerlach Property rises from south to north; the northerly portion of the Gerlach Property rises steadily from behind the buildings to Terrace Street, so as to make it difficult for one to easily traverse on foot. The surrounding area continues to rise to the north, past Terrace Street, through the immediate neighborhood, and up to Hubbard Park, a recreational/natural area located near the top of this hillside. This hillside also travels from the rear of the Statehouse to Hubbard Park.

13.     Within the neighborhood that surrounds the Gerlach Property, Terrace Street provides a distinct separation between the professional and state offices that occupy the buildings on Baldwin and Hopkins Streets and the residential areas along the northerly boundary of Terrace Street. In fact, the zoning district boundary line between the CIV District and MDR District runs along the center line of Terrace Street. Residences continue along the streets that flow north from Terrace Street, including Richardson Street, Chapman Road, Mather Terrace, and the northerly portion of Bailey Avenue.

14.     Appellants provided an aerial map of the neighborhood that surrounds the Gerlach Property, with elevation lines incorporated by Appellant's engineer, Richard DeWolfe. This aerial photo of the surrounding neighborhood was admitted at trial as Appellants' Exhibit 43.

15.     Parking is allowed along both sides of Terrace Street, except during the winter plowing season, which includes (at least) the months of December through March. There is not great demand for parking along Terrace Street when the Legislature is not in session, although several area residents regularly park along Terrace Street because their residential lots are small and provide little or no on-site parking.

16.     However, when the Legislature is in session, and the parking ban is no longer in effect (that is, especially during the months of April and May), vehicles are often parallel parked along much of the south side of Terrace Street, including along the northerly boundary of the Gerlach Property, which abuts Terrace Street. An example of these parking circumstances is shown by Exhibit 9, labeled "Peak Parking Conditions," offered by Appellants and admitted at trial. Credible testimony revealed that as many as thirteen cars have been parked along the south side of Terrace Street during the Legislative session, when the winter parking ban is not being enforced.

17.     This reality of Terrace Street being an area, at least during some months, for off-site parking by neighbors and visitors to our Statehouse is in marked contrast to the credible description Appellants provided for their neighborhood. When Appellants describe their neighborhood, their description often does not include the Gerlach Property or other office complex and parking area properties to the south of Terrace Street and along Hopkins Street and Bailey Avenue. Appellants accurately describe their neighborhood as a quiet, almost exclusively residential neighborhood, although the neighborhood Appellants describe is limited to that portion of the area surrounding the Gerlach Property that is north of Terrace Street and includes the properties along Richardson Street.

18.     Most of the residences in the area Appellants describe are single family homes, although there are several multi-family homes, including on the property diagonally across Terrace Street from the rear of the Gerlach Property. This multi-family dwelling has a parking area that has two access drives: one from Terrace Street and the second from Chapman Road. The Terrace Street driveway has a width of about 38 feet; the Chapman Road driveway has a width of about 60 feet. This parking area is not screened by trees or landscaping and is large enough to host ten or more parked vehicles.

19.     Home occupations are conducted in one or more of the homes in the area Appellants describe.

III.     Proposed Site Plan.

20.     The Gerlachs propose to construct and maintain a parking area on the north side of their Property, adjacent to Terrace Street. The parking area will include a total of five parking spaces, with one space separated from the others by a 12-foot-wide area of natural vegetation. See Exhibit G-RG-14.

5

21. The entire Gerlach Property, including the site of their proposed parking area, is in the CIV District. Parking lots are a permitted use in the CIV District.

22. The northerly portion of the Gerlach Property has trees, brush, and other natural vegetation that provide a screen from the commercial and office developments along Baldwin Street and beyond, including the government offices, banks, and other facilities along State Street. The Gerlachs' proposed parking plan will require that some of these trees and brush be removed. However, especially as revised prior to trial, the site plan will limit the cutting in such a manner so as to preserve some of the natural screening for the residential properties to the north of Terrace Street. The trees and brush currently in place do not completely block the view from Terrace Street of the properties and development to the south. After development of the proposed parking area, the trees and brush beyond the 20-foot-deep parking spaces will remain and provide reduced screening for residents of and visitors to Terrace Street.

23. The Gerlachs revised their parking area site plan by reducing the grading of the area to be developed, which was accomplished by replacing a more extensive grading plan with a two-foot-high retaining wall just south of the parking area. In addition to the natural vegetation area that will separate parking spaces #1 and #2, existing trees outside of the immediate area of the parking spaces will be preserved along the remaining length of the Gerlachs' northerly boundary. Additional hemlock trees will be added on the east and west sides of the parking area, as shown on Exhibit G-RG-14.

24. The parking area will be located about 6.25 feet south of the limits of Terrace Street. The total width of the parking area (including the area between spaces #1 and #2 that will remain naturally vegetated) will be 60 feet; each parking space will be about 9 feet wide and 20 feet deep and located inside the Gerlach northerly boundary. The four adjoining parking spaces will span an opening of 36 to 40 feet; the 12-foot vegetated area will interrupt the parking area clearing, with the fifth space located farthest to the west. The five parking spaces will be cleared of vegetation and topped with gravel, as will the 6.25-foot area between each space and the southerly boundary limits of Terrace Street. In total, the Gerlachs' revised plan will disturb approximately 1,200 square feet of vegetated area.

25. The elevation difference on the Gerlach Property from the north to the south is such that it will be difficult for users of the proposed parking area to walk from the parking area directly to the Gerlach office building. Instead, the Gerlachs propose that their parking area users walk east

6

on Terrace Street, south on Hopkins Street, and west on Baldwin Street to their offices. The total distance of this walk appears to be no more than 200 to 300 yards.

26. Terrace and Hopkins Streets currently do not have sidewalks; Baldwin Street does have sidewalks. No additional sidewalks are planned as part of the Gerlach parking development.

27. The most frequent users of the proposed Gerlach parking spaces will be the Gerlach tenants and their employees; those who occupy the Gerlach offices will most likely reserve the parking spaces near the buildings for their business invitees and guests.

28. Once construction is completed, the Gerlachs will prohibit parallel parking on Terrace Street in front of their new parking spaces. They will also install and maintain small directional signs at the south end of each parking space, advising that the spaces are only to be used by the office employees at 7 Baldwin Street.

29. The Gerlachs have offered to allow their residential neighbors to use their proposed parking spaces during non-business hours.

30. For the last several years, a portable basketball hoop has been maintained on the Gerlach Property and used by area neighborhood children. The Gerlachs have offered to allow this portable basketball hoop to remain on the northern edge of their property for as long as it remains in use by neighborhood children.

31. As proposed, users of the proposed five parking spaces will either pull directly into the parking space, or back in, and then exit in the opposite direction. As designed, there will not be the ability to pull onto the Gerlach Property and reverse direction while remaining on the Property. Therefore, to use these proposed spaces, vehicles will at some point have to use Terrace Street to back in or back out of the parking spaces.

32. Appellants proposed that the Gerlachs relocate their proposed additional parking area to the south of their property, so that it may be accessed via Baldwin Street. One such alternative would relocate the proposed parking area to the east of the Gerlach buildings; another to the west of the buildings. However, each proposal presents significant physical challenges.

33. The land to the east of the existing Gerlach driveway slopes downward and would require some fill. Their easterly boundary is near their existing driveway, thereby making it unlikely that the minimum area needed for additional parking exists on the Gerlach Property. The land to the west of the Gerlach office building rises steeply from Baldwin Street and includes ledge; to install a parking area on this side of the Gerlach Property would likely require blasting and the

7

removal of a significant, presently healthy elm tree. Further, access to this parking area could only be had over the state office building lands known as 9 Baldwin Street. No credible evidence was presented at trial that the state would be willing to convey an easement or license for this access, or would authorize the sharing of this access with the tenants at the Gerlach Property. As compared to the parking area proposed by the Gerlachs, this alternate proposal suggested by Appellants would require over 4,000 square feet of earth disturbance and likely require ledge to be blasted.

IV. Safety and traffic issues.

34. Terrace Street is a public road with a paved width of approximately 19 to 20 feet; its total width is about 30 feet.

35. Terrace Street has a posted vehicle speed limit of 25 miles per hour. Vehicular traffic on Terrace Street generally derives from the ingress and egress of neighborhood residents, although it is often used by visitors who may be searching for parking near the State Capital or adjacent facilities.

36. Many area residents and visitors walk on Terrace Street and the other nearby streets that connect the neighborhood, the State Capital, and nearby offices.

37. The winter parking ban is a necessity on Terrace Street: there is little space in the public roadway for snow to be plowed, thereby resulting in plowed snow remaining in the travelled portion of Terrace Street. In fact, during winters of heavy snowfall, the width of Terrace Street narrows.

38. Appellants and Applicants each conducted their own limited traffic studies and sight distance analysis. While none of them are experienced in the science of traffic analysis, the parties' respective studies provided some credible evidence upon which the Court bases the following Findings:

    a. Terrace Street has a very low volume of traffic. Even during its estimated hours of highest traffic volume (7:30 AM to 8:30 AM and 4:30 PM to 5:30 PM), Terrace Street experiences five to ten one way vehicle trips per hour.

    b. Terrace Street has an average of no more than 75 to 100 one-way vehicle trips per day.

    c. Guidelines established by the Vermont Agency of Transportation ("VTrans") generally do not include recommended sight distances for intersections or driveways where the volume of traffic on the town or state highway is as low as the traffic volumes on Terrace Street.

d. Guidelines established by the American Association of State Highway and Transportation Officials ("AASHTO") include recommendations for the required minimum sight distances to allow on-coming traffic to safely stop for vehicles entering a highway from an intersection, parking area or driveway. For a roadway such as Terrace Street, with its estimated volumes and traffic speed, the AASHTO Guidelines recommend a minimum sight distance of 125 feet.

e. The proposed parking area is located on Terrace Street in such a manner so as to allow for acceptable sight distances of on-coming vehicles travelling from either direction on Terrace Street. These sight distances meet or exceed the applicable AASHTO Guidelines.

f. The proposed parking area is sited near the crest of Terrace Street; the Street elevation gradually declines in either direction from its crown, located just west of the proposed parking area. Thus, drivers traveling on Terrace Street in either direction will have a clear view of the vehicles entering or exiting the proposed parking area.

39. The surrounding neighborhood, especially north of Terrace Street, is home for many families, including those with young children. Area children often use Terrace Street to ride bicycles and to play basketball and other games.

40. The neighborhood north of Terrace Street is unique for its character of a quiet residential neighborhood, which is in stark contrast to the bustling government and private offices that are literally a stone's throw away. The tranquility of this neighborhood may be a function of its terrain and partially wooded areas, but is also a testament to the labors of its residents towards keeping their neighborhood quiet and residential in character.

## Conclusions of Law

The City of Montpelier Zoning and Subdivision Regulations ("Regulations")[3] provide general standards by which all proposed developments in the City are to be evaluated; Article 7 of the Regulations provides those general standards. Given that Article 7 governs all development, some of its standards are not as applicable to certain types of development; whether a particular section of Article 7 applies depends upon the scope and intensity of the proposed development. Given that the pending application relates only to a portion of the development of 7 Baldwin Street—the proposed five-space parking area—our analysis here

---

[3] The Regulations in effect when the pending application was submitted to the DRB were first adopted on August 21, 2002 and amended through May 14, 2008. The Regulations have since been amended further. However, we look to the Regulations in effect when the completed application was submitted to the DRB. See, e.g., In re Sisters and Brothers Inv. Group, LLP, 2009 VT 58, ¶ 4, 186 Vt. 103.

includes a determination of whether each Article 7 provision raised by Appellants in their Statement of Questions is applicable to the Gerlachs' proposed five-space parking area.

Appellants' Statement of Questions contains 16 Questions, spanning some, although not all, of the general standards listed in Article 7. We have chosen to review each of Appellants' Questions according to the applicable section from Article 7 to which they refer, so that we may best complete a review of the applicable sections. Our analysis results in a review of Appellants' Questions that does not follow their chronological order, but rather allows us to follow the Article 7 standards chronologically.

In interpreting Article 7 we apply the same standards of construction as those employed when interpreting a statute. See, e.g., In re Stowe Club Highlands, 164 Vt. 272, 279–80 (1995). That is, we look to the plain and ordinary meaning of the words in the municipal regulations and give effect to their whole and every part. Id. at 279 (citing In re Vt. Nat'l Bank, 157 Vt. 306, 312 (1991)). Our review proceeds with this instruction in mind.

## I.    Regulations § 702: Streets.

Regulations § 702 provides general standards by which the streets proposed within a development, and a development's impact upon existing streets, may be evaluated. Section 702.A directs that the "arrangement, character, extent, width, grade and location of all streets shall be consistent with the [City of] Montpelier Municipal Plan." The wording of § 702.A infers that it relates solely to new streets within a proposed development.

The proposed parking area does not propose any new streets. We therefore conclude that the requirements in § 702.A for streets within a proposed development are not applicable to the pending parking lot application. We understand that Appellants, by their Question 13, ask whether, pursuant to § 702.A, "the proposed parking lot is suitably designed and/or located, especially given the residential character and non-conforming width of Terrace Street." But we find no language within Regulations § 702.A that provides such a standard of review for an application that suggests no new streets and therefore **DISMISS** Appellants' Question 13. To the extent that the suitability of the proposed parking area design can be considered under other sections of Article 7 that Appellants have preserved for our review, we have conducted that analysis in later sections of this Decision.

Regulations § 702.C directs that new "development shall not cause unreasonable congestion or unsafe conditions with respect to use of existing streets and intersections." The

section continues with permissive language that authorizes the DRB in the first instance (and by implication, this Court on appeal) to require an applicant to submit a traffic impact study and to seek guidance from "VTrans and/or other appropriate traffic engineering or safety resources." Id.

By their Question 14, Appellants ask whether the proposed parking area will satisfy the general standards of Regulations § 702.C. We conclude that it will. The parking area will accommodate no more than five vehicles; the vehicles that do use this proposed parking area will most likely be driven by office employees, who the credible testimony revealed are less likely to come and go from the parking spaces as frequently as would the customers, clients, or guests to those offices. These employees are unlikely to use these parking spaces during non-business hours.

We found credible Appellants' description of their neighborhood as tranquil and fostering the family activities that the neighborhood residents enjoy. But we found their prediction of the dire consequences that will be caused by the proposed parking area much less credible. Terrace Street currently experiences a very low volume of traffic, especially considering its proximity to the state Capital Complex. The parties appeared to agree that the current traffic volumes do not exceed 100 one-way vehicle trips per day. While the proposed parking area could bring as many as 15 additional one-way vehicle trips to Terrace Street, that volume cannot support a legal conclusion that traffic on the neighborhood streets will become unreasonably congested or unsafe because of the addition of these five parking spaces. While the added vehicle trip generation may increase traffic volume by as much as fifteen percent, this estimated maximum (115 one-way trips per day) will not change the assessment of Terrace and the surrounding streets as enjoying a very low volume of traffic. The proposed parking area is not the equivalent of the shopping center complex that Appellants used as an analogy in their legal arguments.

In fact, the proposed parking area will reduce the number of cars parked on Terrace Street. The area on the Gerlachs' northern boundary now occasionally plays host to several vehicles that are parked parallel to the Street, sometimes partially within the boundaries of Terrace Street. The proposed parking area will prohibit up to three vehicles from parallel parking in this area, thereby reducing the estimated net addition to two parked vehicles during the nine months when the winter parking ban is not in effect. The proposed parking area will

11

move up to three parked vehicles off of the right-of-way limits of Terrace Street and on to the Gerlachs' private property.

Regulation § 702.C presents us with a standard that is stated in the negative: the proposed development "shall not cause unreasonable congestion or unsafe conditions with respect to use of existing streets and intersections." Based upon our Findings, we conclude that this legal standard will not be breached. We therefore conclude that the Gerlachs' proposed parking area satisfies Regulations § 702.C and rule in Applicants' favor on Question 14.

## II.     Regulations § 703.A: Pedestrian Access and Circulation.

Regulations § 703.A, titled as a "Purpose" provision for this subsection of Article 7, directs that "[l]ot layout, site design, and site elements shall provide for pedestrian circulation, such as through the provision of sidewalks, bicycle paths, easements, or some combination thereof." Regulations § 703.A(1). Appellants, by their Question 15, ask whether "the proposed parking lot provides for safe and adequate pedestrian circulation between parking area and building entrance, and whether the provision of pedestrian facilities is required." For the reasons detailed below, we conclude that the proposed parking area adequately provides for safe pedestrian circulation, thereby negating the need to require Applicants to install additional pedestrian facilities.

We first note that § 703.A(1) appears to address the needs to accommodate pedestrian access and circulation within developments that would be much larger and more complex than the Gerlach parking area; this Regulation references developments that would include various lots, site design, and site elements. This proposed development is rather simple and singular; it is comprised of a single parking area for five vehicles. It has no more design elements than that and contains no additional lots or no new buildings.

By our Decision on Appellants' pre-trial motion for partial summary judgment, we established that Regulations § 703.A contains enforceable standards, even though it is titled "Purpose." See In re Gerlach Parking Area Permit, No. 31-2-09 Vtec, slip op. at 7–9 (Vt. Super. Ct. Envtl. Div. Dec. 21, 2009). We noted that § 703.A(2) requires that a new development incorporate additional pedestrian facilities "whenever necessary to serve existing or projected pedestrian traffic, to provide safety along vehicular traffic locations, or to provide connections to existing pedestrian facilities." Id. at 7 (quoting Regulations § 703.A(2)). We declined to grant Appellants summary judgment on this legal issue, since the parties presented a genuine dispute

12

as to the material facts concerning pedestrian safety. Now that we have received and assessed the trial evidence, we conclude that additional pedestrian facilities are not necessary and agree with Applicants that individuals parking in their proposed parking lot will be able to safely walk along Terrace, Hopkins, and Baldwin Streets to their offices on the Gerlach Property.

Appellants offered convincing testimony that Terrace Street is frequently used for walking by neighborhood residents and visitors. Far less credible are their representations that Terrace Street is dangerous for walkers, especially during the winter months, or will become less safe because of the addition of walkers from the up to five additional vehicles that will be parked in the Gerlach parking lot. Living in Vermont requires agile footwork, especially during the winter months. Living in or near the CIV District of the City requires an integration of both vehicle and pedestrian traffic. We heard no credible testimony that travel along Terrace Street and the surrounding area will be measurably affected by the added walkers to and from the vehicles that park in the proposed parking area.

The one-block walking distance suggested by the Gerlach parking plan is necessary because the terrain of the Gerlach lot, from north to south, makes walking difficult within the lot. In fact, developing an internal walking path and steps would likely require significant additional clearing of trees and brush on the Gerlach lot. The additional walkers that the proposed parking lot will bring to the Terrace Street neighborhood are likely to be indistinguishable from the neighbors and visitors who already walk along these neighborhood streets, and are unlikely to cause a measurable increase in the walkers in the neighborhood. Requiring Applicants to install sidewalks or other pedestrian facilities would likely cause measurable disruption to this neighborhood, with no showing that their addition is needed.

For these reasons, we conclude that the Gerlach parking area, as proposed, conforms to Regulations § 703.A, thereby deciding Appellants' Question 15 in Applicants' favor.

### III. Regulations § 704: Vehicular Access and Circulation.

Much trial time was devoted to legal and factual disputes raised by the standards expressed in Regulations § 704: do the standards for "driveways" apply to the proposed parking area (per § 704.A) and does the proposed parking area consist of one or more "conflict points," as that term is used in § 704.A(1) and (2). We address these issues succinctly, since we conclude that there is little room for actual debate.

13

The proposed parking area is just that; it is not a driveway,[4] whether we rely upon a common definition of the term or rely upon the wording of the Regulations. First, we note that the proposed parking area does not provide access to the Gerlach buildings; individuals using the proposed parking area must walk along the nearby streets to access the Gerlach buildings, as noted above. Access to the Gerlach buildings is provided by the pre-existing driveway, which represents a textbook example of an access way that constitutes a driveway.

Regulations § 704.A begins its definition of private driveways with the phrase "access roads." Based upon this regulatory definition, as well as the multiple definitions of the term provided at trial and revealed in our research, we find not credible the suggestion that the proposed parking area constitutes one or more "driveways." Therefore we respond to Appellants' Question 11 by concluding that § 704.A is not applicable to the pending parking lot application and therefore **DIMISS** that Question.

We next turn to Appellants' Question 10, which asks "[w]hether the proposed parking lot is consistent with the relevant access management criteria set forth under [Regulations] § 704.C(1) & (2)." Subsection (1) of § 704.C makes specific reference to the VTrans Access Management Program Guidelines,[5] which note that the goal of access management "is to achieve a safe and efficient flow of traffic along a roadway while preserving reasonable access to abutting properties" and that "[a]chieving this goal requires a careful balancing act in the application of access design standards and regulations." 3 (2005).

Both the VTrans Guidelines and § 704.C(1) speak to separating the various conflict points along a roadway and limiting the number of separate conflict points, all in pursuit of maintaining traffic safety. In this regard, we consider the Gerlach parking lot as a single, new conflict point, much like the intersections of Terrace Street with Hopkins Street, Richardson Street, Chapman Road, and the driveway for the multi-family parking area each represent a single, separate conflict point. Were we to follow Appellants' logic in classifying the Gerlach parking lot as establishing five driveways or conflict points, we would need to classify the intersection of Terrace and Richardson Streets as representing four conflict points: two points represented by vehicles turning onto Richardson from Terrace Street in each direction, and two

---

[4] Appellants' expert suggested during trial that the proposed parking area actually consists of five driveways. We found this suggestion to not be credible.

[5] The VTrans Access Management Program Guidelines are available at:
http://www.aot.state.vt.us/vam/Documents/AccManProgGuidelinesRev072205.pdf .

14

points represented by vehicles turning from Richardson Street in either direction on Terrace Street. This logarithmical expansion of classifying conflict points is unprecedented and provides unnecessary confusion to the process of analyzing traffic intersections.

The term "conflict point" is commonly used in traffic analysis to reference intersections or curb cuts along a town or state highway; these intersections provide the most "conflict" with established highway traffic patterns. Thus, when a new development is being evaluated, state and municipal regulations focus attention on the new conflict points that a proposed development creates, so that it may be determined whether the new development and its traffic conflict points will adversely affect highway safety. Since the term "conflict points" is not defined in the Regulations, we rely upon this common understanding of what constitutes a traffic conflict point.

The Gerlach parking lot is located away from each of the intersections on Terrace Street, including the multi-family driveway on the north side of Terrace Street. The Gerlach parking lot is not in direct conflict with any of the established access ways along Terrace Street. While the proposed parking area will require its users to back in from or out to Terrace Street, due to the low volume of existing traffic on Terrace Street and limited number of additional vehicles coming and going from the Gerlach parking area, we conclude that the standards for access management established in or referenced by § 704.C(1) and (2) will be satisfied.

The design of the proposed parking area also represents a trade-off and compromise enabling the satisfaction of all applicable regulatory standards. A design that requires vehicles to back into or out of the parking area and on to Terrace Street is not ideal, but allows for minimum earth disturbance and removal of trees and brush on the Gerlach Property. Much of the natural vegetative screen between the two zoning districts can be maintained under the proposed site plan. Traffic along Terrace Street is unlikely to be adversely impacted, and may even be improved by the replacement of parallel parked vehicles that are sometimes partially on the street with parked vehicles that are completely off the street. Thus, we conclude that Regulations § 704.C(1) and (2) will be satisfied, and will be accomplished in such a manner as to allow the permitted development to occur with the minimal removal of trees and other natural vegetation from the Gerlach Property.

By their Question 9, Appellants suggest that the proposed parking area "is impractical," especially when compared to the alternative parking lots Appellants suggest could be located on the southerly portion of the Gerlach Property and accessible from Baldwin Street. See Findings

15

of Fact ¶¶ 32 and 33, above. Respectfully, we conclude that quite the opposite is true. Neither alternate location can be wholly located on the Gerlach Property; were this Court to require the Gerlachs to adopt either of these alternate site plans, their development would be impossible without acquiring additional rights to land that is already used by the state facilities on either side of their property. Both of the alternate plans would require many times more excavation and perhaps the blasting of ledge. The westerly plan would require the removal of a large tree that was credibly described as healthy. If any proposed parking plan could be described as impractical, it is both of Appellants' alternate plans and not the parking plan Applicants propose.

Appellants' Question 9 references Regulations § 704.C(3), which encourages "interconnected" parking lots and "common entrances" on adjoining lots, "whenever practical." There is no capability to share interconnect parking lots or use common entrances with the state property to the east; sharing the entrance or parking lots with the state property to the west of the Gerlach Property would require considerably more earth work, probably blast work to remove ledge, and will be difficult to traverse, due to differences in elevation between the lots and Baldwin Street. We conclude that this sharing of entrances and interconnecting of lots is impractical and therefore not required for conformance with Regulations § 704.C(3). We therefore decide in favor of Applicants on Question 9.

IV.    Regulations § 705: Parking.

Regulations § 705.A and B speak to when a new development is required to provide "off-street" parking spaces and, if so, what number of parking spaces the developer should be required to provide, based upon the type and size of the proposed use. By their Question 7, Appellants ask whether these regulatory provisions require the proposed parking. Most important to our analysis here is that no new development is proposed on the Gerlach Property that would trigger the parking requirements in these regulatory provisions. Rather, the uses established on the Gerlach Property have already been permitted, with the requisite parking.

The Gerlachs filed the pending application after having recognized that the established uses on their property required additional parking to fully accommodate their professional office tenants, employees, business invitees, and guests. Thus, we need not analyze what parking is required under Regulations § 705.A and B, since no new use is proposed that would trigger a parking requirement. We therefore **DIMISS** Appellants' Question 7.

16

While no new development or use is proposed that would trigger required parking, we note that Regulations § 705.B authorizes the DRB (and by implication, this Court on appeal) to "increase or decrease these standards if deemed appropriate to accommodate the parking needs of an individual applicant." Here, the undisputed testimony reflected that the existing available parking on the Gerlach Property, numbering eight spaces at most, was insufficient to accommodate all users. Applicants originally submitted a request for approval of seven spaces, but later reduced their request to five spaces, so as to reduce the impact of their proposed parking area and allow for additional vegetative screening to remain on the parcel. While not specifically challenged in this appeal, we concur with the DRB that the five requested parking spaces are needed for the operation of the Gerlach Property and therefore exercise the discretionary authority under Regulations § 705.B to approve those five additional parking spaces.

By their Question 16, Appellants ask whether the proposed "parking lot must conform to the off-site parking distance requirements as set forth" in Regulations § 705.F. But § 705.F only governs "private off-site parking" proposals and Appellants concede that Applicants plan only suggests new parking spaces on the same site where the offices are located for those who will use this parking. Appellants have not provided the Court with a legal foundation for how we could require an on-site parking plan to conform to regulations for off-site parking; our own review of § 705 provides none as well. We therefore conclude that Regulations § 705.F is not applicable to the pending application and **DIMISS** Appellants' Question 16.

By their Question 8, Appellants ask whether, pursuant to Regulations § 705.G, "the circumstances warrant imposition of a replacement parking fee in lieu of the proposed parking lot" Section 705.G authorizes a waiver from the minimum number of parking spaces otherwise required under the Regulations. While § 705.G contains no specific reference, we conclude that this waiver applies to the minimum parking spaces required pursuant to Regulations § 705.A and B. Again, we note that no new development is proposed by this application that would trigger the minimum parking standards of § 705.A and B; we therefore cannot discern how the criteria for a waiver from the minimum parking requirement is applicable to the pending application. Further, we note that the application contains no request for such a waiver. Rather, Appellants appear to reference § 705.G because one of the prerequisites for granting such a waiver is a finding that requiring the minimum parking on a development site "would create adverse conditions with respect to landscaping, or the design characteristics of the property or

adjacent properties, or the purpose of the design control district." But in the absence of a waiver request, and in the absence of a requirement to install minimum parking, we conclude that the provisions of § 705.G are wholly inapplicable to this application. We therefore **DIMISS** Appellants' Question 8.

V.    Regulations § 707: Siting of Parking and Loading Spaces.

By their Question 6, Appellants challenge whether the location of the proposed parking lot is consistent with the purpose provisions of Regulations § 707.A. We note again, as we did in our pre-trial Decision on Appellants' motion for partial summary judgment, that purpose statements in zoning regulations generally have "no direct regulatory effect." In re Meaker, 156 Vt. 182, 185 (1991). Such aspirational statements serve to guide the interpretation and enforcement of the other regulatory provisions. This does not mean, however, that all provisions titled "purpose" have no direct regulatory effect. We must look to a regulations' specific language to make that determination, so we look to the specific language of § 707.A:

> Parking and loading spaces are intended to be accessory uses to the primary use of a lot. As such, they should not be allowed to visually dominate the appearance of a lot. Location of parking and loading areas behind buildings and away from public streets, avoidance of parking in front yards, and appropriate landscaping and screening can help to accomplish this purpose.

The language of § 707.A appears aspirational in tone and does not contain directives on how an application is to be evaluated in connection with the stated aspirations. Because § 702.A states aspirations only, we must look to other sections of § 707 to understand how to determine whether the landscaping and screening is "appropriate." Purpose provisions of a zoning regulation provide guidance, but are of no direct regulatory effect. Meaker, 156 Vt. at 185. There being no direct regulatory effect to § 707.A, we must **DISMISS** Appellants' Question 6.

Before leaving our analysis of this Regulation, however, we note that the Gerlach proposed parking lot appears to conform to all of the specifically-stated aspirations of § 707.A: the proposed parking is in the rear of the Gerlach Property; it is not located in the front of the lot; does not appear to dominate the lot; and is a minor accessory use, when compared to the primary use at the Property, which is the office buildings.

Section 707.C directs that when development is proposed in a non-residential zoning district that abuts a residential zoning district, "the parking and/or loading spaces shall be no closer than 15 feet to the property line abutting the residential district, and the spaces shall be

18

screened and landscaped." By their Question 1, Appellants ask whether the proposed parking area conforms to § 707.C. Appellants also raised this Question in their pre-trial motion for partial summary judgment; the Court addressed this Question in a portion of its pre-trial Decision, but concluded that because a genuine dispute as to the facts relating to screening and landscaping existed, the matter could only be resolved through trial. See In re Gerlach Parking Area Permit, No. 31-2-09 Vtec, slip op. at 3–5 (Vt. Super. Ct. Envtl. Div. Dec. 21, 2009).

Undisputed trial testimony revealed that the MDR District is a residential zoning district. The boundary between it and the CIV District, in which the Gerlach Property is located, is the center line of Terrace Street. Also undisputed is that the travelled (paved) portion of Terrace Street is 19 to 20 feet wide, and that there is a 6.25 foot buffer between the travelled portion of Terrace Street and the edge of the proposed parking area. Thus, we conclude that the proposed parking area is more than 15 feet from the MDR District boundary.

Much trial testimony and legal argument was also consumed by the question of whether the proposed parking spaces are screened. The Gerlachs have revised their site plan to limit the size of the area to be disturbed by their construction by adding a two-foot-high retaining wall to the immediate south of the proposed parking spaces. While their initial plan called for much of the trees and natural vegetation to remain on the northern portion of their property, the revised site plan and retaining wall will preserve even more trees and natural vegetation. Their plan also calls for the addition of new trees and landscaping. Once completed, the proposed parking area will retain a natural vegetative screen and landscaping that is compatible with the surrounding neighborhood and the various uses and activities that occur within it.

Appellants expressed sincere concerns that this parking area will reduce the existing screening they currently enjoy from the commercial and professional activities of Baldwin Street, State Street, and the surrounding area. It is indisputable that some trees will be cut and some vegetation cleared. However, we reject interpretations of Regulations § 707.C that would act as an absolute bar to any tress or vegetation being cut, or that would require that the established screening and landscaping must act as an absolute sight barrier between the two zoning districts. The cutting proposed is so limited as to have a minimal effect on the overall screening. The resulting parking area will allow some vehicles to be viewed from some of the residences on the north side of Terrace Street, just as their current view from Terrace Street includes vehicles that are parallel parked on the Street.

19

The neighborhood surrounding the Gerlach Property currently has many parking lots and many vehicles parked along the streets; the proposed parking area will add a few more parked vehicles to the neighborhood. These additional parked vehicles can best be described as de minimus.

To summarize, in light of the standards established in Regulations § 707.C, we find that the proposed parking site plan is adequately spaced away from the boundary of the nearby residential zoning district and it provides for adequate landscaping and screening,. We therefore conclude that the proposed plan conforms to Regulations § 707.C and find in Applicants' favor on Question 1.

VI.     Regulations § 708: Landscaping and Screening.

By their Question 5, Appellants suggested that Regulations § 708.E requires that the proposed parking area have "ground level screening." Subsection (1) specifically authorizes the DRB (and by implication, this Court on appeal) to require that parking areas (and other uses not applicable to this application) "be screened from public streets and adjacent land uses." Regulations § 708.E(1). This provision provides the DRB and this Court with discretionary authority to impose additional screening requirements, as a condition of its approval of a development. In exercising this discretion, we conclude that the proposed parking area site plan calls for landscaping additions and the preservation of a sufficient number of trees and other natural vegetation that will provide adequate screening for the adjacent streets and neighboring residences.

Our above discussion concerning screening requirements imposed by Regulations § 707.C is also applicable here: screening should not be interpreted as an obligation to establish an absolute sight barrier. The existing screening provides a filter, but not a block, to the visuals of the commercial and professional developments at lower elevations. While some trees and vegetation will be removed as a result of Applicants' proposed parking area, the remaining land and growth will provide an adequate screening for the residential neighbors to the north.

Were we to interpret either § 708.E(1) or § 707.C to require an absolute sight barrier, no development could be authorized. More important to our analysis is that neither regulatory section contains language that could be so interpreted. Regulations § 708.E(1) does not mandate screening; it provides discretion to direct screening that is appropriate, given the circumstances and characteristics of the surrounding neighborhood. With that standard in mind, we conclude

20

that the proposed parking area conforms to § 708.E(1), and decide in Applicants' favor on Question 5.

Section 708.F provides a similar discretion to the Court as § 708.E to direct that a proposed development include a screening or buffering component when adjacent to a residential area, although its standard is differently stated: "to minimize the impact of the institutional use on a less intense residential land use." Regulations § 708.F(1). By their Question 4, Appellants challenge whether the proposed parking area conforms to § 708.F. We conclude that it does.

Were we evaluating a development that introduced an industrial use, or even a new professional office development to the southerly boundary of Terrace Street and its residential neighborhood, we might be reaching a different outcome in this de novo appeal. However, the development proposed here is accessory to an already-established building of professional offices; it is minor in scope (in that it consists of only five parking spaces) and is a use (parking) that already exists in the surrounding neighborhood.

The existing screening along the southern border of Terrace Street is thick in some areas, thin in others; nowhere does it serve as a complete barrier to the views of the neighboring professional office spaces. In some places along Terrace Street, the natural vegetative screening that currently exists is less than that which will be in place after this parking area is constructed and put into use. We conclude that the proposed parking area conforms to § 708.F, without the requirement that additional screening be established. We therefore decide in Applicants' favor on Question 4.

## VII.    Regulations § 715: Site Protection and Design.

By their Question 2, Appellants challenge the proposed parking area's conformance to Regulations § 715.C, which requires that a development "minimize grading and cut and fill and shall retain, to the degree possible, the natural contours." To emphasize their concern, Appellants referenced in their Question 2 the alternate parking area sites that they suggested at trial on the southerly portion of the Gerlach Property, nearest to Baldwin Street. There is some irony in this reference, since the grading at the proposed site will be minimal, but the grading, blasting, cut, and filling for the alternate sites would be much more extensive. The proposed site conforms to § 715.C; the alternate sites proposed by Applicants do not. We find in Applicants' favor on Question 2.

By their Question 3, Appellants ask whether the "tree clearing for the proposed parking lot on the forested hillside portion of the subject property . . . is necessary to meet [the] off-street parking requirements for 7 Baldwin Street." Appellants also make reference in their Question 3 to the alternate parking sites they proposed during trial.

Regulation § 715.E requires that "[d]evelopment on a forested hillside shall be minimally visible and shall blend in with its surroundings in the winter months." We are uncertain that this regulatory provision applies to this proposed development, since "forested hillsides" is not a term defined or identified in the Regulations. One might suspect that a community's zoning regulations that seek to protect a forested hillside might more likely be focused on a more expansive undeveloped area. The subject property is in the CIV District, which is host to extensive development, including the state Capital Complex. Nonetheless, we evaluate the proposed parking area for conformance with Regulations § 715.E.

The Gerlach parcel is surrounded by development: commercial, government, or professional development to the east, west, and south; residential development to the north. The parcel is not so much located within a forested hillside; it is a previously-developed lot that has a forested hillside on a portion of it.

Applicants have done a commendable job at limiting the tree clearing that this proposed parking area will require. The post-construction site will still contain a forested hillside. The proposed parking area will be seen by residential neighbors to the north, but it will be screened and not particularly visible from most directions. The clearing for this proposed development is "limited to the amount necessary for reasonable use of the property." Regulations § 715.E. To the extent that § 715.E is even applicable to this developed section of the CIV District, the proposed parking area conforms to those regulatory requirements. We find in Applicants' favor on Question 3.

By their Question 12, Appellants ask "[w]hether the proposed parking lot is designed in harmony with the surrounding area, as is required by § 715.G." Section 715.G directs that a "development and the location, height, bulk, design, and materials of the buildings shall be designed in harmony with the surrounding area." First, we note that this development contains no buildings; there is no "height, bulk, design [or] materials" to assess. Thus, we only must assess whether the proposed parking lot is "designed in harmony with the surrounding area."

The proposed parking lot has been designed to limit the cutting of existing trees and vegetation. It is of a minimal size and is located in a zoning district and surrounding neighborhood where large and small parking areas are prevalent. This development will introduce no more than five new parked vehicles, and as few as two additional parked vehicles, to a residential street where vehicles are already parked along the street. From nearly all adjacent properties, views of the proposed parking area will be screened by trees and other natural vegetation. While new, this proposed development will be in harmony with the surrounding area and is therefore in conformance with regulations § 715.G. We find in Applicant's favor on Question 12.

## Conclusion

For all the reasons more fully discussed above, we conclude that Regulations §§ 702.A, 704.A, 705.A, 705.B, 705.F, 705.G, and 707.A are not applicable to the Gerlachs' proposed parking lot site plan and therefore **DISMISS** Appellants' Questions 6, 7, 8, 11, 13, and 16. We conclude that the proposed parking lot conforms to the general standards articulated in Regulations §§ 702.C, 703.A, 704.C(1)–(3), 707.C, 708.E(1), 708.F, 715.C, 715.E, and 715.G and therefore rule in Applicants' favor as to Appellants' Questions 1–5, 9, 10, 12, 14, and 15. For all these reasons, we hereby **GRANT** design review and site plan approval for Ralph and Sharon Gerlachs' proposed five-space parking area on the northern portion of a previously-developed parcel, identified as 7 Baldwin Street and located between Baldwin and Terrace Streets in the City of Montpelier.

These proceedings are remanded to the City of Montpelier Zoning Administrator, solely for the purpose of issuing a zoning permit in conformance with this Decision and the unappealed provisions of the City of Montpelier DRB decision of January 22, 2009.

This completes the current proceedings before this Court concerning this application. A Judgment Order accompanies this Merits Decision.

Done at Berlin, Vermont this 4th day of April 2011.

_____
Thomas S. Durkin, Environmental Judge

23

## TERRACE STREET CL PROFILE

SCALE: HOR. 1"=20'
VERT. 1"=5'

EXISTING CENTER LINE GRADE

DRIVER'S EYE 3.5' ABOVE ROAD

LINE OF SIGHT

WORSE CASE CONSERVATIVE VEHICULAR SIGHT DISTANCE = 155'

WEST PROPERTY BOUNDARY
3+86.92

| PARKING SPACE #1 |
| GREEN SPACE |
| PARKING SPACE #2 |
| PARKING SPACE #3 |
| PARKING SPACE #4 |
| PARKING SPACE #5 |

3.5" HIGH OBJECT

5+18.90
EAST PROPERTY BOUNDARY

## PLAN VIEW - PROPOSED PARKING

SCALE 1"=20'

NORTH

CHAPMAN STREET

NEW 6' HIGH HEMLOCK

EXISTING ASH TREES

ASH TREE TO BE REMOVED

RETAINING WALL 6FT HIGH

SLOPE 2H

TERRACE STREET

RICHARDSON STREET

NEW 6' HIGH HEMLOCK

GRAPHIC SCALE

( IN FEET )
1 inch = 20 ft.

## SPEATH
### ENGINEERING
111 HARMONY LANE, MANCHESTER, VT 05255

ELLIS H. SPEATH
VT. PR. LIC. #464

SIGHT DISTANCE
STUDY
FOR:
7 BALDWIN STREET
MONTPELIER, VERMONT

EXHIBIT

| | | | | | REVISIONS | |
|---|---|---|---|---|---|---|
| | | | | | PARKING LAYOUT | 5-3-10 |
| | | | | | GRADING | 5-4-10 |
| | | | | | TREES | 5-5-10 |

| DRAWN | EHS | |
| CHECK | | |
| DATE | 5-26-10 | |
| SCALE | AS NOTED | |
| PROJ. NO. | 10-09 | |

SHEET: 1 OF 1